STATE of Oklahoma, ex rel. and Jack HART, d/b/a Osage Wholesalers, Petitioner,

v.

Roy P. PARHAM, Director, Oklahoma Alcoholic Beverage Control Board, Respondent.

ALL BRANDS SALES COMPANY, a partnership composed of Ernestine Kunc and Frank J. Kunc, et al., Plaintiffs in Error,

v.

OKLAHOMA ALCOHOLIC BEVERAGE CONTROL BOARD, composed of Archie Stout, Logan Garnett, Charles Johnson, Hewey Rozelle, and M. G. McCool, as members, and Roy P. Parham, as Director of the Oklahoma Alcoholic Beverage Control Board, Defendants in Error.

Nos. 41745, 41774.

Supreme Court of Oklahoma.

Jan. 25, 1966.

Rehearing Denied in 41774, Feb. 22, 1966.

Walter Dean Hart, Pauls Valley, for petitioner.

George Miskovsky and John Embry, Miskovsky, Sullivan, Embry, Miskovsky & Turner, Oklahoma City, James L. Kincaid, Lupardus, Holliman & Huffman, Tulsa, for plaintiffs in error.

Charles Nesbitt, Atty. Gen., and Joseph C. Muskrat, Asst. Atty. Gen. for respondent and defendants in error.

HODGES, Justice.

On November 3, 1965, Jack Hart, DBA Osage Wholesalers, a wholesale liquor dealer, filed in this Court a petition for a writ of mandamus to the Oklahoma Alcoholic Beverage Control Board, directing the Board to enforce its rule referred to as Amendment No. 29.

At that time there was in force a temporary restraining order issued by the District Court of Oklahoma County, restraining the Board from enforcing Amendment No. 29. It had been issued in an action filed in that Court on October 15, 1965 by 15 of the 18 liquor wholesalers in Oklahoma. On November 19, 1965, after having taken extensive testimony, the District Court of Oklahoma County vacated the restraining order and refused to issue an injunction to prevent the enforcement of the rule. Plaintiffs in that case then appealed to this Court and at the same time intervened in the original action for mandamus previously filed in this Court by Jack Hart. All parties to both actions are now before this Court, and all seek the answer to the same question of law: does the Board have the power to promulgate and enforce its rule called Amendment No. 29?

The purpose of Amendment No. 29, hereinafter referred to simply as "the rule", is stated as follows in its preamble:

" * * * to prevent the circumvention of any law by means of the so-called 'Franchise System' in Oklahoma and in order to prevent any discrimination, conspiracy, or agreement which would have as its purpose and be designed to create a monopoly, or create an exclusive privilege, or provide an advantage for one licensee over another licensee in the making of sales of alcoholic beverages, or permit the fixing of prices or the destroying of competition among wholesalers * * *."

The body of the rule is as follows:

"SECTION 1: (a) Wholesalers shall register prices, purchase and keep on hand, or have on order, a fifteen (15) day supply of all brands constituting the top eighteen (18) brands in total sales during the past twelve (12) month period immediately prior to June 1, 1965, which were made by Non-Resident Sellers to Oklahoma wholesalers of spirits and wines according to the records of the Board and as revised by the Board quarterly from time to time, PROVIDED, However, If the records of the Board indicate that a Non-Resident Seller has more than one brand in the top eighteen (18) brand classification only the brand representing the greatest total in sales of such Non-Resident Seller shall be included in the top brand classification.

(1) No transfers of any one or more of said top eighteen (18) brands shall be made from one wholesaler to another, except with written permission of the Board or the Director, and then only in quantities not to exceed three (3) cases on a one time basis for each brand.

(b) All wholesalers are hereby specifically prohibited from engaging in any type of discrimination, conspiracy, collusion, agreement or understanding, orally or in writing, which would have as its purpose and be designed to create a monopoly, destroy competition, or give advantage to one or more wholesaler over other wholesalers or fix prices of alcoholic beverages.

(c) The foregoing section shall also apply to all manufacturers, distillers, non-resident sellers, and retail dealers, and their representatives, agents and employees.

(d) All wholesalers after the adoption of this rule shall, in placing an order for alcoholic beverages with a Non-Resident Seller, on the same date provide the Board with a copy of each Purchase Order so placed. Each Purchase Order shall be numbered in sequence, shall bear the date the order was placed, the type, brand, container size and full description of all alcoholic beverages ordered, showing the name of the Non-Resident Seller with whom such order was placed. All Non-Resident Sellers shall fill orders from all licensed wholesalers in sequence and without discrimination in price, promptness of making shipments, or other service.

(e) Non-Resident Sellers shall extend uniform credit to all licensed wholesalers without discrimination. Exceptions to this provision may only be granted by the Board or the Director upon written request setting out the reasons, if any, for any non-uniformity in credit.

(f) All rules or parts of rules in conflict herewith are hereby repealed.

(g) The violation of this rule, or any provision thereof, by one or more licensees shall constitute grounds for the suspension or revocation of license by the Board or the Director.

(h) The provisions of this rule are severable and if any provision thereof shall be void the decision of the court so holding shall not affect or impair the remaining parts or provisions of this rule.

This Board finds that imminent peril to the public health, safety and welfare requires the adoption of this rule as an emergency rule without prior Notice or further hearing for the reasons set out above."

The arguments and objections of the fifteen wholesalers in their appeal are directed almost entirely against subsection (a) of the rule which provides that each wholesaler shall have in stock or on order a 15 day supply of each of the 18 best selling brands of liquor. The only other portion of the rule to which the wholesalers have directed argument is subsection (a) (1) which limits transfers among wholesalers to three cases for each of the 18 brands. Our opinion will therefore deal primarily with the "minimum inventory requirement" of the rule.

We will hereinafter refer to the parties to the appeal from the District Court proceeding as "the wholesalers" and as "the Board." The resolution of the issues presented by the wholesalers in their appeal will likewise be determinative of the petition of Jack Hart for the writ of mandamus.

The rule was adopted on October 13, 1965, after an investigation and study by the Board, and a report to it by the Director to the effect that the liquor wholesalers of Oklahoma had entered into an agreement creating a voluntary franchise system whereby each wholesaler would carry in stock only a limited number of major brands, which would not be offered for sale by any other wholesaler. Information compiled from Board records showed that during each of the four months preceding September, 1965, the average number of cases of liquor transferred among wholesalers was about 992; but for September, the month in which the voluntary franchise system was allegedly placed in effect, the number of cases transferred was 22,098.

At the hearing in the trial court proceeding, several retail liquor dealers testified that they had been personally informed by certain wholesalers or their representatives that the wholesalers had divided the various major brands of liquor among themselves and were to specialize in their allocated brands; that it was now necessary that they submit purchase orders to six or more wholesalers whereas prior to September, 1965, they had been able to secure the same brands from one or two wholesalers and that they would prefer to continue to order from a limited number of wholesalers; and that is was not practical to order non-stocked brands of liquor from wholesalers due to the two to three week delay in receiving shipment whereas it took only one or two days to receive delivery on stocked items. One dealer testified that he had been informed by a named wholesaler that the wholesalers "had had a meeting and that they had decided to go franchise in this area and that at a later date they would go franchise in the Tulsa area if the franchise in the Oklahoma City area proved successful." The wholesalers who testified denied any such collusive arrangement. While several wholesalers admitted a recent reduction in the number of brands stocked, they attributed the reduction to the exercise of independent business judgment

reflecting consumer demand at their particular houses. The accountant for the Board testified as to the quantities of inventory transfers between wholesalers over the past several months including the radical increase in such transfers during the month of September, 1965, as reflected by the Board's records. These records also revealed the particular brands, and the quantities thereof, carried by various wholesalers subsequent to the September transfers, and indicated that in certain areas of the State there was virtually no overlapping of major brands stocked by wholesalers located therein. The Director of the Board testified that prior to September of this year there had been no such restricted merchandising of alcoholic beverages on the part of the wholesale houses but that most of the wholesalers had been multiline distributors stocking most of the major brands.

The Director further testified that in order to arrive at the top eighteen brands by including no more than one brand for each non-resident seller, as required by the rule, it was necessary to go through the brand that ranked thirty-third in total sales. The Director also testified concerning the formula to be applied in calculating the inventory requirements of the rule. First, a total fifteen day supply for each of the eighteen brands was ascertained by dividing the total sales of each brand, for the twelve month period preceding June 1, 1965, by twenty-four. Next, each wholesaler was allocated his fractional portion of the total fifteen day supply of each brand. The fractional portion of each wholesaler was based on the percentage that each wholesaler's total sales were of the total sales of all wholesalers for the first nine months of 1965.

■ In our opinion the evidence presented to the trial court fully justified the Board's conclusion that there was indeed a voluntary franchising arrangement in effect among most of the wholesalers of this State. By agreement, the individual wholesalers divided the major brands among themselves and voluntarily agreed not to stock the major brands not allocated to them. This franchise agreement was implemented by means of large inventory transfers between the wholesale houses in the month of September.

It is the position of the wholesalers on appeal (1) that neither the Constitution nor the statutes of this State delegate power to the Board to require minimum inventories; (2) that any delegation of power to require minimum inventories would be an unconstitutional delegation of legislative authority; and (3) that the minimum inventory requirement is unreasonable and arbitrary and a denial of due process of law.

■ At the outset we must recognize that the liquor industry because of the very nature of its product requires strict control and close supervision. As a result, the Legislature by virtue of the police power of the State possesses broad powers to regulate and supervise all phases of traffic in intoxicating liquors. See Application of Kay, Okl.Cr., 341 P.2d 284. It is a generally accepted concept that "the power of a state to regulate and restrict the liquor traffic is far broader than the power to regulate or restrict ordinary businesses, because of its effect on the health and welfare of the public. * * *" 30 Am.Jur. Intoxicating Liquors, Sec. 24. To the same effect, see 48 C.J.S. Intoxicating Liquors § 20.

This Court has recognized that the Legislature must, of necessity, often delegate responsibility to, and rely upon, administrative boards and commissions if it is to effectively fulfill its responsibilities. In State ex rel. Villines v. Freeman, Okl., 370 P.2d 307, we stated: "The creation of administrative boards, agencies, commissions and similar instrumentalities, with rule-making powers, is an incident of the development of what is called 'administrative law'. 'The social and economic problems of a power age with its increased governmental control and supervision of private activities requiring for their solution the services of specialists and experts have created a new sphere of governmental activity embracing

in itself all three aspects of governmental powers, legislative, executive and judicial. These administrative complements are euphemistically called, 'filling in the details' of a policy set forth in the statutes. But the 'details' are of the essence; they give meaning and content to vague contours. * * * 42 Am.Jur. Public Administrative Law, Section 4." There is a peculiar need for an administrative body to provide close surveillance and regulation of the liquor industry because of the numerous and complex problems that arise and the inability of the Legislature to anticipate specific problems and to maintain effective continuing supervision.

With these general principles in mind, we now examine the question of whether the Board has the power to promulgate and enforce the rule designated Amendment No. 29. The first contention advanced by the wholesalers is that no authority has been delegated to the Board to require minimum inventories on particular brands.

The Board was created by a constitutional amendment adopted by the people in 1959, now codified as Article XXVII, Oklahoma Constitution. Section 1 of this Article leaves the powers and authority of the Board entirely to the discretion of the Legislature. Section 3 of this Article directs the Legislature to enact "laws providing for the *strict* regulation, control, licensing, and taxation of the manufacture, *sale, distribution, possession,* and transportation of alcoholic beverage, consistent with the provisions of this Amendment." (Emphasis supplied.) The Legislature subsequently enacted the Oklahoma Alcoholic Beverage Control Act, now codified as 37 O.S.1961, § 501 et seq. It is Section 514 of this Act that defines the powers and duties of the Board. It provides in part as follows:

"The Board shall have the following powers and duties:

(1) To supervise, inspect, and regulate *every phase* of the business of manufacturing, importing, exporting, transporting, storing, *selling, distributing, and possessing* for the purpose of sale, all alcoholic beverages which shall be necessary and proper to carry out the purposes of this Act;

(2) To promulgate rules and regulations, in the manner herein provided, to carry out the purposes of this Act; * * *

(13) To exercise all other powers and duties conferred by this Act, and all powers incidental, convenient or necessary to enable it to administer or carry out any of the provisions of this Act." (Emphasis supplied.)

It is difficult to conceive of a broader or more all-inclusive grant of power. Considered in conjunction with Section 503 which declares the Act to be an exercise of the police power, it would seem that the Legislature intended to extend to the constitutional limit the boundaries of the grant of power to the Board. While it may be conceded, as the wholesalers point out, that there is no specific reference in the Act to a "minimum inventory requirement", the Board is vested by Section 514 with complete authority to regulate all phases of the sale, distribution, and possession of alcoholic beverages "which shall be necessary and proper to carry out the purposes of this Act." The crucial question then is whether the minimum inventory requirement imposed by the rule is necessary to effectuate the purposes of the Act. If so, the Legislature has delegated the requisite authority to the Board; if not, no such delegation was intended. See Ex Parte Woodruff, 90 Okl.Cr. 59, 210 P.2d 191; Boydston v. State, Okl., 277 P.2d 138.

Upon examination of the Act as a whole, we think that it clearly expresses an intent on the part of the Legislature that, within the framework of strict regulation which the liquor industry by its nature requires, the commercial aspects of the industry shall be operated under the conditions of free and unrestricted competition. The Act is replete with provisions directed to this objective. Section 521 authorizes,

inter alia, each licensed manufacturer, wholesaler, and retailer to compete with every other licensed manufacturer, wholesaler, and retailer, respectively, in the sale and distribution of intoxicating liquors. Section 524 (b) authorizes each licensed non-resident seller to compete with every other licensed non-resident seller by soliciting and taking orders from all licensed wholesalers in this State. Section 533 requires a manufacturer to sell to every licensed wholesaler on the same price basis and without discrimination. This section also prohibits "tied-sales" (requiring the purchase of one item in order to obtain another item) or the imposition of any quota system as a condition to the wholesaler's receipt of the manufacturer's products. Section 535 consists of express and detailed prohibitions against financial assistance from any manufacturer or wholesaler to any retailer. It further prohibits "tied-sales" or the imposition of any quota system against either wholesalers or retailers. Section 536 contains prohibitions against price discrimination against wholesalers or retailers, and forbids the granting of any "discount, rebate, free goods, allowance or other inducement". The constitutional amendment also requires each manufacturer to sell to *every* licensed wholesaler on the same price basis and without discrimination. Okla.Const. Art. XXVII, Sec. 3. It is apparent on the face of all these sections that their general purpose is the prevention of any tendency toward monopoly, or the control of the industry by any segment or special interest group, with the resulting destruction of competition.

■ It is clear that under the voluntary franchise agreement adopted by the wholesalers the extensive competition heretofore existing between wholesalers selling the same brands of liquor would be destroyed. The wholesalers advance the argument that the issue here involved is not a franchise system or what can be done to prevent it, but is simply whether wholesalers may be required to stock items of merchandise which they do not desire to carry in their regular inventories. We disagree. The rules promulgated by the Board are not to be judged in a vacuum, but by the realities to which they relate. Board action required to effectuate the policy objectives of the Legislature will necessarily vary according to the factual conditions prevailing in the liquor industry. We take cognizance of the fact that the rule in question, as stated in its preamble, was specifically designed to combat the voluntary franchise system. However, we make no determination of the wisdom of a liquor franchise system, be it voluntary or involuntary. That is a matter for determination by the Legislature and the people of the State of Oklahoma. Our decision is limited, as it should be, to an examination and application of the provisions of Article XXVII of our Constitution and the Oklahoma Alcoholic Beverage Control Act.

■ The wholesalers cite certain provisions of the Act that forbid *manufacturers* from requiring wholesalers to stock their merchandise. See Sections 533 and 535(4) of the Act. It does not follow, however, as contended by the wholesalers, that this is indicative of a Legislative intention that the *Board* may not impose such a requirement. The legislative purpose, as seen above, was to provide for unrestricted commercial competition. Unilateral action either by the manufacturers or by the wholesalers to establish a franchise system thwarts this objective; whereas the action of the Board encourages this competition at least as to the specified eighteen brands. The wholesalers also rely on Oliver v. Oklahoma Alcoholic Beverage Control Board, Okl., 359 P.2d 183. In that case this Court concluded that the Board does not have the power to fix retail liquor prices. We pointed out that the legislative history of the Act showed a definite legislative intention that the Board should not have such power in that proposed minimum mark-up provisions were stricken by the Legislature prior to final passage of the Act. In the cases now before us, it cannot be said that the legislative history of the Act shows a legisla-

tive intention that the Board should *not* have the authority to prevent franchising arrangements. Furthermore, the failure of subsequent attempts to legalize the franchise system in this State makes it clear that both the people and the Legislature continue to adhere to their disapproval of the liquor franchise as expressed in Article XXVII of the Constitution and in the Act. In 1962, the people rejected a proposal to amend our Constitution to permit the franchise system. Referendum No. 135 (H.J.R. 543), defeated: See Oklahoma Session Laws 1963, p. 771. More recently the Legislature has refused to resubmit this issue to the people. S.J.R. 15, defeated: See Senate Journal, 30th Leg., Apr. 6, 1965, p. 630 (perm. ed.); H.J.R. 533, unanimously stricken: See House Journal, 29th Leg., June 10, 1963, p. 1073 (perm. ed.).

■ The Legislature intended to delegate broad authority to the Board to regulate possession of intoxicating liquors; and, under the circumstances existing in the liquor industry, the minimum inventory requirement of the rule tended to effectuate the purposes of the Act.

■■ We do believe that the Board has exceeded its authority in the enactment of subsection (a) (1) of the rule by restricting transfers of the specified 18 brands to three cases per brand. The Act expressly provides in Section 521(e) that "[a] wholesaler's license shall authorize the holder thereof: * * * to sell spirits and wines to wholesalers authorized to sell same * * *." As this provision of the rule imposes an unqualified limitation upon transfers among wholesalers in contravention of Section 521(e) of the Act, it is void and unenforceable. We hasten to add that this section of the Act authorizes only good-faith sales between wholesalers. Should the wholesalers attempt to continue the franchise system by means of excessive transfers among themselves, the Board may suspend or revoke their license by invoking subsection (b) of the rule which forbids transfers for this purpose. Also Section 537(b) of the Act expressly prohibits licensees

from receiving, possessing, or selling any alcoholic beverage except as authorized by their license *and* by the Act. As seen above, transfers in support of a voluntary franchise system are not authorized by the Act.

We turn now to an examination of the second contention of the wholesalers. They argue here that if the Act does delegate authority to the Board to require minimum inventories, it is an unconstitutional delegation of legislative power to an administrative board. Okla.Const. Art. IV, Sec. 1 and Art. V, Sec. 1.

■ It is well settled in this jurisdiction that the power to determine the policy of the law is primarily legislative and cannot be delegated, whereas the power to make rules of a subordinate character in order to carry out that policy and apply it to varying conditions, although partaking of a legislative character, is in its dominant aspect administrative and can be delegated. Associated Industries v. Industrial Welfare Commission, 185 Okl. 177, 90 P.2d 899; Atchley v. Board of Barber Examiners, 208 Okl. 453, 257 P.2d 302; Schmitt v. Hunt, Okl., 359 P.2d 198. The general rule is that if the statute involved lays down the policy of the Legislature and establishes a standard or guideline for administrative action, the delegation is proper. Ex Parte Herrin, 67 Okl.Cr. 104, 93 P.2d 21; Ludwig v. Yancey, Okl., 318 P.2d 450. From an analysis of these cases and others it is clear that the standards or guidelines set by the Legislature must often, of necessity, be expressed in general terms or arrived at by an analysis of the legislation as a whole. To require detailed and minute guidelines to the Board would be to destroy the flexibility and effectiveness required in dealing with the many and varying factual situations that arise in carrying out the policy set by the Legislature. Bailey v. State Board of Public Affairs, 194 Okl. 495, 153 P.2d 235. In rejecting the contention that the standards set forth in the Act in question were too vague and uncertain, the Court in Patterson v. Stanolind Oil &

Gas Co., 182 Okl. 155, 77 P.2d 83, quoted the following rule with approval:

> " 'An act will not be declared inoperative and ineffectual on the ground that it furnishes no adequate means to secure the purpose for which it was passed, if men of common sense and reason can devise and provide the means, and all the instrumentalities necessary for its execution are within the reach of those intrusted therewith.' "

▮▮▮▮ It has also been recognized in this jurisdiction that where a statute is enacted by virtue of the police power of the State for the public welfare, as is the Oklahoma Alcoholic Beverage Control Act, and it is impossible or impracticable to provide adequate standards without defeating the legislative objective, the legislation is constitutional without such standards. Ex Parte Woodruff, 90 Okl.Cr. 59, 210 P.2d 191. The control of liquor traffic is a complicated and difficult task. The Legislature should be accorded considerable discretion as to the method to be employed in providing the necessary control and supervision required.

In Oliver v. Oklahoma Alcoholic Beverage Control Board, supra, this Court quoted from 11 Am.Jur. Constitutional Law, Sec. 240:

> " * * *
>
> "It is difficult to define the line which separates legislative power to make laws from administrative authority to make regulations. Clearly the legislative body must declare the *policy of the law* and fix some kind of *legal principles* which are to control in given cases. It must provide an adequate *yardstick for the guidance* of the executive or administrative body or officer empowered to execute the law, because regulations made by executive officers are valid only as subordinate to a legislative policy sufficiently defined by statute, and must, moreover, be *within the framework of such policy.* * * * " (Emphasis supplied.)

As heretofore noted, we find in our Constitution and statutes a clear intention of the people and the Legislature that, within the framework of strict regulation which the liquor industry by its nature requires, the commercial aspects of the industry shall be operated under the conditions of free and unrestricted competition. We think this intention constitutes the "policy of the law" mentioned in the quotation immediately above.

We think the "yardstick for the guidance" of the Board "within the framework of such policy" is indicated in Sec. 3 of Article XXVII of our Constitution and in 37 O.S. 1961, § 533. These sections plainly prohibit the manufacturers or makers of liquor from imposing any system of exclusive franchises "from the top down". The fact that it apparently did not occur to the writers of the constitutional amendment, and the members of our Legislature, that the wholesalers might, by private agreement, attempt to circumvent a right guaranteed by our Constitution, and impose a franchising arrangement "from the bottom up", does not change the basic policy of the law. On the contrary, it merely illustrates the wisdom of the Legislature in confiding to a Board, with rule-making powers, the responsibility of effectuating the policy of the law (free and unrestricted competition) within the framework of guidelines indicated by the law (rules designed to prevent exclusive franchises).

The wholesalers have attempted to restrict competition by the voluntary division of the major brands of liquor among themselves. That the rule, requiring a minimum inventory of major brands, does impose a restriction upon the desired method of operation of these wholesalers is apparent; but it is equally apparent that the rule conforms to the constitutional and legislative interdiction against the franchise and is designed to encourage the unrestricted competition among wholesalers in the commercial market that the Legislature anticipated and intended when the Act was adopted.

As the Act contains a sufficient standard or guideline and the policy of law is clearly expressed, there has been no unconstitutional delegation of legislative power, and the rule is a result of the proper exercise of administrative rule-making authority.

The two cases primarily relied upon by the wholesalers are not in conflict with our decision in the instant case. State ex rel. Anderson, Attorney General v. Mermis et al., 187 Kan. 611, 358 P.2d 936; Terry Carpenter, Inc. v. Nebraska Liquor Control Commission, 175 Neb. 26, 120 N.W.2d 374. Both Courts held that the Legislature of their States had not constitutionally delegated authority to enact liquor price-fixing regulations. These cases are in general agreement with our opinion in the Oliver case, above cited, on the question of price-fixing. On the question now before this Court these cases are not helpful since they consider constitutional and statutory acts different from our own and are not concerned with the validity of minimum inventory requirements.

The third main contention of the wholesalers is that the rule adopted by the Board is arbitrary and unreasonable and a denial of due process of law. Okla.Const. Art. II, Sec. 7; U.S.Const. Amend. XIV, Sec. 1.

There can be no question that the State by the exercise of its police power is fully competent to regulate every phase of traffic in intoxicating liquors. Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620; Crane v. Campbell, 245 U.S. 304, 38 S.Ct. 98, 62 L.Ed. 304; Application of Kay, Okl.Cr., 341 P.2d 284. In Ex Parte Herrin, 67 Okl.Cr. 104, 93 P.2d 21, the Court quoted the following statement of the meaning and requirements of due process from the case of Nebbia v. People of State of New York, 291 U.S. 502, 54 S. Ct. 505, 78 L.Ed. 940:

"'* * * And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts.'"

We have held that the license to operate as a wholesale liquor dealer issued under the Alcohol Beverage Control Act is a valuable privilege, though a purely personal one, subject to being revoked or suspended only in accordance with the provisions of the Act. Oklahoma Alcoholic Beverage Control Board v. Milan, Okl., 393 P.2d 823. We agree with the wholesalers that the Board may not enforce any rule that arbitrarily and unreasonably interferes with this privilege. But it is well settled that the rules and regulations of administrative boards enacted pursuant to legislative authority are presumed to be reasonable and valid, and the burden of establishing the contrary rests on the party complaining. Oklahoma Operating Company v. State Dry Cleaners Board, Okl., 206 P.2d 295; Ex parte Woodruff, 90 Okl.Cr. 59, 210 P.2d 191; Associated Industries v. Industrial Welfare Commission, 185 Okl. 177, 90 P.2d 899. The Alcoholic Beverage Control Board in particular must be accorded wide latitude if it is to effectively fulfill its function of maintaining strict surveillance and close control of the sale and distribution of intoxicating liquors. McCanless v. Klein, 182 Tenn. 631, 188 S.W.2d 745; State ex rel. Thornbury v. Gregory, 191 Wash. 70, 70 P.2d 788; Boehl v. Sabre Jet Room, Inc., Alaska, 349 P.2d 585. Therefore, the rule enacted by the Board is presumed to be valid and its reasonableness will be tested by a consideration of all the facts and circumstances surrounding its enactment.

The wholesalers argue that they will suffer financial hardship and possibly be forced out of business if required to stock a fifteen day supply of the eighteen leading

brands. Several of the wholesalers did testify that an additional capital outlay of approximately $100,000.00 dollars for inventory would be required in order to comply with the rule. The wholesalers so testifying admitted that this figure was only a very general estimate on their part. We find this argument unconvincing. The accountant for the Board testified that in the month of October, 1965, he had made an exact compilation of the total number of cases of liquor that each wholesaler had in stock of the eighteen brands in question, and also of the total number of cases that each wholesaler would be required to have in stock upon adoption of the rule. In each instance, the total number of cases required by the rule was *less* than the total number of cases the wholesaler then had in stock of the eighteen brands. The value of the then current inventory of each wholesaler for the brands involved exceeded that required by the rule, in amounts varying from about $4,500.00 to in excess of $150,-000.00, according to Board records. Of course in order to comply with the rule, without additional cash outlay, most of the wholesalers would have to readjust their inventories to carry more brands (18) in smaller quantities, as had been their practice prior to the adoption of the franchise system. The inventory readjustment for this purpose may be accomplished by the wholesalers by means of inventory transfers among themselves as subsection (a) (1) of the rule limiting transfers to three cases per brand has been invalidated.

If the wholesalers should choose to comply with the rule solely by means of additional inventory investment, the testimony of the accountant for the Board established that the maximum capital expenditure for any wholesaler would be $70,992.42 and that the minimum would be $17,909.36.

In Duke Molner Wholesale Liquor Co. v. Martin, 180 Cal.App.2d 873, 4 Cal.Rptr. 904, cert. den., 364 U.S. 870, 81 S.Ct. 112, 5 L.Ed.2d 92, the Court upheld the validity of a rule of the Department of Alcoholic Beverage Control which provided, inter alia, that each wholesaler must maintain at all times a stock of liquor equal to 5 percent of his total annual sales to retailers or a stock in excess of one hundred thousand dollars. Therein the Court stated:

" * * * It is generally agreed that the liquor industry is one which greatly affects the public health, safety, welfare and morals of the people * * *, that those in the industry must operate subject to strict control of constitutional authorities. * * * "

The Court found the rule to be reasonable and proper even though it imposed "a high standard of economic stability for those who are to hold wholesalers licenses." The inventory requirement in the instant case is considerably less than that imposed upon the wholesalers in the cited case. Under the rule adopted by the Board, the wholesalers must maintain in stock or have on order an amount of liquor equal to about 4 percent of their annual sales for only the 18 leading brands out of the some 700 brands on the market. We hold that this inventory requirement is not unreasonable.

The wholesalers also express the fear that if the Board may constitutionally require the stocking of a fifteen days' supply of eighteen brands, it could, by virtue of the same authority, arbitrarily enlarge the requirements as to length of time or number of brands so as to systematically force first one wholesaler, then another, out of business. This fear is unfounded. We find no malicious motive on the part of the Board in adopting the rule nor any design to favor any particular wholesalers. It was the conduct of the wholesalers themselves that brought about this action by the Board. Until the adoption of the franchise system, free and open competition existed for the most part among the wholesalers in the purchase and sale of intoxicating spirits. If at some future date the philosophy of unrestricted competition should again prevail among the wholesalers, the Board possesses the flexibility to amend the rule to meet the changed conditions or to abolish the rule if it is no longer needed.

The fact that the rule is sustained will not vest unlimited power in the Board to regulate inventories as is asserted by the wholesalers. All actions by the Board, as in the instant cases, are subject to judicial review, by the District Court (37 O.S.1961, § 531; 75 O.S.1965 Supp. § 318) and by the Supreme Court (Okla.Const. Art. VII, Sec. 2). The due process clauses of the state and federal constitutions afford protection against arbitrary and unreasonable administrative action. Associated Industries v. Industrial Welfare Com'n, supra; Ex parte Woodruff, supra; 16 Am.Jur.2d Constitutional Law, Sections 550, 555.

 In our opinion the rule requiring that wholesalers maintain a fifteen day supply of eighteen leading brands is reasonable and is designed to achieve the legislative objectives as expressed in the Act. The rule does not require the wholesalers to maintain an inventory for which there is no demand, but rather to rearrange their inventories to carry a minimum of eighteen of the *best selling* brands as had been their practice prior to implementing the franchise agreement. In addition, the rule requires a quarterly re-examination by the Board of its records to revise both the fifteen day inventory requirement for each wholesaler and the eighteen brand classification to reflect current sales. The competition among wholesalers resulting from the rule is in keeping with the intent of the people of this State and the Legislature as expressed by the constitutional amendment and by the Act.

While the briefs of the parties in these consolidated cases do not consider the remaining provisions of the rule, we have examined these provisions and find them to be reasonable and proper enactments to administer and carry out the purposes of the Act, and to enable the Board to prevent circumvention of the minimum inventory requirement of the rule.

 None of the provisions of the rule are interdependent upon subsection (a) (1) which we have herein held to be void. As the invalid provision in severable, the validity of the remainder of the rule is not impaired.

In the concluding paragraph the Board adopts the rule as an emergency measure without prior notice and without further hearing. This procedure is permitted by the Administrative Procedure Act when there is an imminent peril to the public welfare. 75 O.S.1965 Supp. § 303(b). Both the Legislature and the people have determined that the liquor franchise does not serve the public interest of this State. The Board therefore correctly concluded that immediate action was required to counteract the voluntary franchise system already being implemented by the wholesalers by means of extensive inventory transfers. In addition, the record establishes that the wholesalers were represented at both Board hearings, on October 5 and October 13, 1965, and thoroughly explained their position and objections to the rule to the Board.

In case No. 41774, which is the appeal by the wholesalers from the District Court of Oklahoma County, the judgment of the trial court is affirmed with the proviso that subsection (a) (1) of the rule is void and unenforceable.

In case No. 41745, the original action for writ of mandamus by Jack Hart, the writ is denied, since the Director of the Oklahoma Alcoholic Beverage Control Board has expressed in open court his intention to enforce the rule as soon as his right to do so is established in this Court.