609 P.2d 747 (1980)
In re the Mental Health of K.K.B.
No. 51467.
Supreme Court of Oklahoma.
January 15, 1980.
Rehearing Denied April 28, 1980.
Charles R. Hogshead, Tulsa, for appellant.
Christopher A. Hansen, New York Civil Liberties Union, New York City, for amicus curiae.
Wesley G. Gibson, Chief Counsel, State Dept. of Mental Health, Oklahoma City, for appellee.
*748 DOOLIN, Justice:
This appeal involves the right of a legally competent person involuntarily committed to a medical facility pursuant to 43A O.S. 1978 Supp. § 54.1, to refuse to consent to the administration of certain anti-psychotic drugs.
In July 1977, K.K.B., after a jury trial, was ordered admitted to Eastern State Hospital at Vinita, Oklahoma, as a person in need of treatment defined by statute. After her admission, K.K.B. refused to consent to the administration of anti-psychotic drugs by hospital personnel. In order to determine what course to follow, the superintendent of the hospital (State) filed an application for a declaratory judgment pursuant to 12 O.S. 1971 § 1651 et seq.
Section 64 of the Mental Health Law, 43A O.S. 1971, was amended by the Legislature just prior to this application effective June 3, 1977. It provides:
"No person admitted to any medical facility shall be considered or presumed to be mentally or legally incompetent except those persons who have been determined to be mentally or legally incompetent in separate and independent proceedings of an appropriate district court."
The trial court found K.K.B., by virtue of this statute, was mentally and legally competent in that no separate or independent proceeding to determine incompetency had been held. However, it interpreted this statute as dealing with general competency other than competency to refuse medication. It found the competency referred to in § 64 had no effect on commitment and treatment procedures.
The court ordered K.K.B. to submit to treatment and authorized the hospital to take such steps as necessary to enforce such treatment. K.K.B. appeals, arguing legally competent persons have a constitutional right to refuse to take powerful drugs that will affect their mental processes and may cause serious side effects.
In 1952, a new era in treatment of psychiatric disorders began through the use of anti-psychotic or psychotropic drugs. These are a class of drugs known as major tranquilizers.[1] K.K.B. is suffering from schizophrenia, the etiology of which is not known. There are no physical symptoms and no physical basis for schizophrenia. However, almost half of the patients comprising the population of our public mental health facilities suffer from this psychosis. It is the most likely disorder to be treated with psychotropic drugs, but the precise nature of the benefits of these drugs is as yet uncertain and the dangers the drugs seek to avoid are usually not great. Psychotropic drugs do not cure schizophrenia and patients rarely recover, but merely go into remission which can also be spontaneous without the use of drugs.[2]
Unfortunately rather unpleasant primary and side effects often accompany the use of psychotropic drugs which many people would prefer to avoid even at the risk of continuing mental disorder.[3]
*749 The public's long dormant interest in the human rights of mental patients has been aroused by vocal formal patients, activists and concerned professionals. It is time to recognize liberty includes the freedom to decide about one's own health. This principle need not give way to medical judgment.
Prior to the 1977 amendment to Oklahoma's Mental Health Law § 64, quoted above, provided a commitment under § 54.1 (previously § 55) could be treated as an adjudication of mental incompetence.[4] That is no longer the case. The question of competency and the right to function as a full citizen must now be adjudicated separately from the question of mental disability. Current practices often cause the two to appear synonymous. They are not. Oklahoma's Legislature through amendments to Title 43A has enacted a credible reform to end, in some areas, the blanket denial of personal rights to patients in mental institutions.[5]
Although it is argued a judicial decision to commit is still an implicit finding patient is unable to make treatment decisions, competency is not a medical decision and should not merge with the commitment decision. Voluntary patients suffering exact symptoms as their committed counterparts are not automatically presumed incompetent to consent. Commitment in an institution does not necessarily mean a person is incapable of appropriately deciding whether or not he prefers to be treated with psychotropic drugs.
Other courts have consistently held a patient in a mental hospital has a constitutional right to meaningful treatment.[6] We adopt this view and hold it is the law in the State of Oklahoma.
Protecting the rights of the mentally ill presents an inordinate number of dilemmas. A patient has an absolute right to meaningful treatment and a contrary right to refuse treatment; a correlative duty is imposed on the state to provide such treatment. For this reason we deal today only with consent to so called "organic therapy" which can change a patient's behavior without his co-operation such as electroshock, psychosurgery[7] and, as in the instant case, the use of anti-psychotic drugs.[8] These treatments are intrusive in nature and an invasion of the body.
State is seeking permission to administer these drugs forcibly to competent patients in nonemergency situations, arguing *750 involuntary commitment allows it to make treatment decisions under its parens patriae power. We do not agree.
In Winters v. Miller, 446 F.2d 65 (2nd Cir.1971), cert. den. 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369, a committed patient brought an action under 42 U.S.C. § 1983 claiming her first amendment right to freedom of religion had been violated by forcible medication. The patient, in Winters, had never been found mentally incompetent and there was no presumption of incompetence under New York law comparable to § 64. The circuit court refused to recognize any public policy argument that because of the nature of the illness as mental, the patient should be denied the right to give an informed consent to the treatment. It held the parens patriae relationship does not materialize until a patient is judicially declared incompetent.[9] We are persuaded parens patriae is not broad enough to control medical decisions of a competent person. Parens patriae arises only when an adult patient has been judicially determined incompetent.[10]
Because something is being done to him when he is forcibly medicated, a patient's emerging constitutional right of privacy may be violated.[11] In Rennie v. Klein, 462 F. Supp. 1131 (D.N.J. 1978), the district court, although denying an injunction against state psychiatrists and officials, supported the view, absent an emergency situation, involuntary mental patients have a right to refuse medication founded on a constitutional right to privacy. Only where the state can show some strong countervailing interest may the right to refuse be qualified either under the police power where a patient presents a danger to himself or other members of society, or under the doctrine of parens patriae under which the state cares for those unable to care for themselves if patient is declared incompetent.
In later stages of this litigation, Rennie v. Klein, 476 F. Supp. 1294 (D.N.J. 1979), the same court held the right to refuse can be realistically afforded only if hospitals obtain specific written consent from patients before they are medicated with any psychotropic drug. Hospitals must also inform all patients of potential side effects of medication and their right to refuse.
"The court feels that the recognition of a right to refuse treatment in a nonemergency situation is practical. The testimony has indicated that involuntary treatment is much less effective than the same treatment voluntarily received. The psychiatric experts stated that it is more likely that a patient will consent to desirable treatment when consulted before action is taken, and when he feels that he has some real control over his fate, than when he feels totally at the mercy of the hospital doctors.
Furthermore, only the patient can really know the discomfort associated with side effects of particular drugs. Again, the experts agree that they must rely on their patients for evidence of subjective feelings of pain associated with drug usage. Individual autonomy demands that the person subjected to the harsh side effects of psychotropic drugs have control over their administration.
It is also difficult for any person, even a doctor, to balance for another the possibility of a cure of his schizophrenia with the risks of permanent disability in the form of tardive dyskinesia. Whether the potential benefits are worth the risks is a uniquely personal decision which, in the *751 absence of a strong state interest, should be free from state coercion."[12]
Another recent decision by the Massachusetts Federal District Court based a mental patient's right to refuse anti-psychotic drugs on the constitutional protection of an individual's right to privacy. Rogers v. Okin, 48 L.W. 2328, 478 F. Supp. 1342 (10/29/79) involved a state statute, which presumed committed mental patients were competent. Absent a guardianship proceeding a patient is presumed competent to manage his affairs, i.e. sell his house and write a will. Certainly these rights are fundamental to any concept of ordered liberty. "Such rights, however, pale in comparison to the intimate decision  one basic to any right to privacy  as to whether to accept or refuse anti-psychotic medicine."
The federal court did recognize fundamental rights may be subordinated to compelling state interests. However forcible anti-psychotic medication of a patient in a state hospital is not necessary to protect the general public. The public is protected by commitment. If there is no emergency, hospital personnel are in no danger; the only purpose of forcible medication in these circumstances would be to help the patient. But the basic premise of the right to privacy is the freedom to decide whether we prefer to be helped, or to be left alone.
The federal court in Rogers v. Okin, supra, enjoined the hospital physicians from forcibly medicating committed mental patients except in emergency situations presenting a substantial likelihood of physical harm to the patient or others.
There is no support in common law for the proposition that treatment, medical or psychiatric, constitutes a legally nonreversible medical decision. Physicians are not legislators. Although psychiatry in the past has resisted attempts to diminish its powers of decision over committed patients it has increasingly conceded, in a society ruled by laws, social actions that infringe or control individual freedoms must be judged by legal standards. According to an American Psychiatric Association Group:
"Except in emergencies, if a patient who is competent to participate in treatment decisions declines to accept treatment recommended by staff, we accept the patient's right to refuse. If the physician believes the patient is not competent to participate in treatment decisions, he should ask a court to rule on the patient's competency. If the patient is found not competent, an impartial third party, designated by the court, should be given the authority of consent."[13]
We adopt this view and the reasoning of the courts in Rennie and Rogers v. Okin, supra. Courts consistently hold the use of drugs for control or punishment, rather than as part of an on-going psychotherapeutic program designed to aid the patient, violates the eighth amendment respecting cruel and unusual punishment.[14] Thus, absent an emergency, the only basis for using psychotropic drugs is to help the patient. With no emergency present K.K.B. and others similarily situated, based on the constitutional right to privacy, have a right to decide whether they wish to be helped.
We must emphasize this opinion is limited to legally competent adults involuntarily admitted to a state mental hospital.[15] A different set of problems is presented if a patient is incompetent or a minor.
Under this holding the hospital may not force K.K.B. to continue use of prescribed psychotropic drugs. Further involuntary treatment would require instigation of a *752 judicial proceeding to have her declared legally incompetent and appointment of a guardian to make an informed decision for her.[16]
If the law recognizes the right of an individual to make decisions about her life out of respect for the dignity and autonomy of the individual, that interest is no less significant when the individual is mentally or physically ill. Because the patient will be the one to suffer the consequences she must have the power to make the decision.
Trial court reversed with directions to enter judgment according to views expressed herein.
LAVENDER, C.J., and WILLIAMS, BARNES, SIMMS and HARGRAVE, JJ., concur.
IRWIN, V.C.J., and HODGES, J., dissent.
OPALA, J., concurs in result.
NOTES
[1] Plotkin: Limiting the Therapeutic Orgy, Mental Patients Right to Refuse Treatment, 72 N.W.U.L.Rev. 461 (1978).
[2] Dubose: "Of the Parens Patriae Commitment Power and Drug Treatment of Schizophrenia: Do the Benefits to the Patient Justify Involuntary Treatment?" 60 Minn.L.Rev. 1149 (1926).
[3] Testimony at trial, judicial decisions and commentators point to many rather toxic and severe primary and side effects accompanying the use of psychotropic drugs such as: dysfunction of the central nervous system called extra pyramidal symptoms; blurred vision, dry mouth and throat, constipation or diarrhea, palpitation, skin rashes, low blood pressure, faintness, fatigue; also sometimes permanent states such as akinesia, akathesia and tardive dyskinesia characterized by rhythmical, repetitive involuntary movements of the tongue, face, mouth or jaw sometimes accompanied by other bizarre muscular activity. Also they may be responsible for a condition wherein white blood cells disappear called agranulocytosis which is fatal in 30%, of the cases. See Rennie v. Klein, 462 F. Supp. 1131, 1138 (D.N.J. 1978); In re Boyd, 403 A.2d 744, 752 (D.C.App. 1979).
[4] Section 64 previously stated:

"No person admitted to any institution in the Department shall be considered legally mentally incompetent except those admitted in accordance with the provisions of Sections 55 and 58 of this Title and those admitted under Section 59 of this Title who have been declared legally mentally incompetent elsewhere."
[5] See Ginsberg, Rights of Mentally Disabled, 20 O.L.R. 117, 134 (1967).
[6] Rouse v. Cameron, 373 F.2d 451 (D.C. Cir.1966); Wyatt v. Stickney, 344 F. Supp. 373, 387, 325 F. Supp. 781, 785 (M.D.Ala. 1972) affmd. sub nom.; Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir.1974); Welsh v. Likens, 373 F. Supp. 487 (D.Minn. 1974); Davis v. Watkins, 384 F. Supp. 1196 (N.D.Ohio 1974); New York State Association for Retarded Children, Inc. v. Rockefeller, 357 F. Supp. 752 (E.D.N.Y. 1973), 393 F. Supp. 715 (E.D.N.Y. 1975). Also see O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).
[7] Psychosurgery is the removal or destruction of brain tissue in the absence of organic brain disease with the primary intent of altering the behavior of the patient. Plotkin, supra, n. 1, quoting Bullock, Neuroscientists on Psychosurgery, 32 Archives Neurology 73 (1975).
[8] Ferleger, Loosing the Chains: In Hospital Civil Liberties of Mental Patients, 13 Santa Clara Lawyer 447, 469 (1973); Mitchell v. Robinson, 334 S.W.2d 11 (Mo. 1960).
[9] In accord Scott v. Plante, 532 F.2d 939 (3rd Cir.1976) holding involuntary administration of drugs which affect mental processes amounts to interference with first amendment rights and claim stated a cause of action under § 1983 of the Civil Rights Act and the first and fourteenth amendments.
[10] The attorney for K.K.B. compares forced drug treatment under the guise of "coercive benevolence" through parens patriae to "cruel kindness," an oxymoron unacceptable in legal logic.
[11] Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976); Superintendent of Belchertown v. Saikewicz, 317 Mass. 728, 370 N.E.2d 417 (1977); In re Young, 48 L.W. 2238 (Cal.Super. Ct. 9/11/79).
[12] Rennie v. Klein, supra, n. 3 at p. 1144.
[13] American Psychiatric Association Task Force Report, p. 12 as quoted in Plotkin, supra, n. 1 at p. 503.
[14] Mackey v. Procunier, 477 F.2d 877 (9th Cir.1973); Knecht v. Gillman, 488 F.2d 1136 (8th Cir.1973); Nelson v. Heyne, 355 F. Supp. 451 (N.D.Ill. 1972); Souder v. McGuire, 423 F. Supp. 830 (M.D.Pa. 1976); Pena v. New York State Division for Youth, 419 F. Supp. 203 (S.D.N.Y. 1976); Naughton v. Bevilacqua, 458 F. Supp. 610 (D.R.I. 1978).
[15] We assume hospitals already recognize the right of voluntary patients to refuse psychotropic drugs and other unwanted organic therapy.
[16] See In re Boyd, 403 A.2d 744 (D.C.App. 1979) and possible application of the "substituted judgment doctrine."