2002 OK 71

**OKLAHOMA PUBLIC EMPLOYEES ASSOCIATION, Billy D. & Earlene Melton, Paul Benefied, Oris D. Davis, Richard C. Jackson, Sr., Helen L. Jackson, Dwain E. Kelley, Roy E. Mitchell, Allena E. Harms, Kathryn Reinauer Freeman, Co-**

---

leen Patterson, Betty Bennan, Linda Turner, Fredetta Jones, Richard F. Buck, Betty Jo Whinnery, Joyce Brown, Pauline V. Terry, Pamela G. Weaver, Kenneth Eugene & Bonnie J. Johnson, Plaintiffs/Appellees,

v.

OKLAHOMA DEPARTMENT OF CENTRAL SERVICES, Tom Jaworsky, State Purchasing Director for the Oklahoma Department of Central Services, and Oklahoma Department of Human Services, Defendents/Appellants,

v.

Stratton Taylor, President Pro Tempore of the Oklahoma Senate, Amicus Curiae.

No. 94,985.

Supreme Court of Oklahoma.

Sept. 24, 2002.

Richard W. Freeman, Jr., Assistant General Counsel, DHS, and John J. Ely, Jr., Assistant General Counsel, DHS, Oklahoma City, OK, for Defendant/Appellant Oklahoma Department of Human Services.

Joseph Walters and John D. Stiner, McAffee & Taft, Oklahoma City, OK, for Defendants/Appellants Oklahoma Department of Central Services and Tom Jaworksky.

Richard A. Mildren and Catherine Napier, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Oklahoma City, OK, for Plaintiff/Appellee Oklahoma Public Employees Association.

Stratton Taylor, President Pro Tempore of Oklahoma Senate, Oklahoma City, Oklahoma, Amicus Curiae/Appellee, Pro se.

SUMMERS, J.

¶ 1 In this case we address whether the Department of Human Services (DHS) is limited to express statutory or constitutional authority for determining its authority to enter into certain contracts. We determine that when express contractual authority is not granted DHS possesses those implied contractual powers that are necessary for the effective discharge of the duties expressly conferred upon DHS. We also conclude that Plaintiffs, as taxpayers, possess standing to challenge an alleged unlawful expenditure of public funds. We affirm the trial court's determination of taxpayer standing, but reverse the summary judgment, because it was based upon the idea that a contractual authority or power would not exist in the absence of authority expressly granting such authority. Motions by DHS, Department of Central Services, and Tom Jaworsky for oral argument are denied.

¶ 2 DHS decided to outsource the management of Robert M. Greer Center Facility (Greer) located in Enid. DHS requested that the Oklahoma Department of Central Services (Central Services) solicit offers for management contracts, whereupon Central Services selected Liberty of Oklahoma Corporation (Liberty) for the management of Greer Center. One contract was awarded to Liberty for one sixty-day period effective November 30, 1999, and an additional contract to run one year through January 31, 2001, with options to renew for nine additional one-year periods.

¶ 3 The plan for managing Greer Center included removing the state employees at those centers from the state payroll, with the successful bidder then hiring those same employees for a period of no less than six months. To implement the outsourcing DHS decided to reduce the total number of state employees at Greer, and thereby decrease the number of employees the successful bidder would be required to hire. DHS obtained permission from the Office of State Finance to offer employees a statutory benefit package for those deciding to voluntarily terminate their state employment prior to the outsourcing. See 74 O.S.Supp.1999 § 840–2.28.

¶ 4 Another facility of DHS is the Northern Oklahoma Resource Center of Enid (NORCE), located on the same property as Greer. The contract with Liberty includes a provision that "food and related supplies" will be obtained by "NORCE staff" "via utilization of state contracts"; that is, that the food and related supplies will be provided by DHS (NORCE) to Liberty. A similar contractual provision requires DHS to provide pharmaceutical and medical supplies. They are to be "procured by the Agency, by NORCE staff via utilization of state contracts and provided to the Contractor [Liberty] via the Shared Goods and Services Agreement...."

¶ 5 Plaintiffs, the Oklahoma Public Employees Association (OPEA) and several individuals, brought suit in the District Court seeking a permanent injunction against implementation of the management contract, and they also sought a declaratory judgment on the lawfulness of outsourcing and the Shared Goods and Services Agreement. Both sides sought summary judgment, and the trial court ruled in favor of Plaintiffs. The court concluded that Plaintiffs had standing, and that the outsourcing was improper because the Legislature had not specifically authorized DHS to outsource the Greer Center. The District Court stayed the effect of its decision pending an appeal. DHS and Central Services appealed and we retained the controversy.[1]

## I. Standing of the OPEA

¶ 6 The trial court granted summary judgment against Central Services and DHS. Summary judgment is an adjudication on the merits of the controversy. *Union Oil Co. of California v. Board of Equalization of Beckham County,* 1996 OK 40, 913 P.2d 1330, 1333. It is appropriate "where there is no dispute as to the material facts or as to the inferences to be drawn from undisputed facts, and the law favors the movant's claim

---

1. DHS and Central Services filed a joint brief and we address their joint arguments as those of DHS.

or liability-defeating defense." *Harkrider v. Posey*, 2000 OK 94, ¶ 8, 24 P.3d 821, 824–825. When the facts are not in dispute a plaintiff's standing may adjudicated on a motion for summary judgment. *Beville v. Curry*, 2001 OK 1, ¶ 9, 39 P.3d 754, 758; *Herring v. State ex rel. Oklahoma Tax Commission*, 1995 OK 28, 894 P.2d 1074, 1076. No facts are in dispute relevant to the standing of the OPEA.

■ ¶ 7 DHS and Central Services argue that OPEA and the individual plaintiffs lack standing to bring the suit. OPEA includes members who are taxpayer/residents and employees at the Greer Center. We address first the standing of the OPEA.

¶ 8 OPEA argues that it has standing if Respondents violated state statutes or public agency rules, because such violations are injuries to the State and its citizens. OPEA further argues that a taxpayer has standing to challenge the illegal creation of a public debt or the illegal expenditure of public funds, and that the proposed action of the Defendants created such debt and expenditure. OPEA further asserts that its members are citizens and taxpayers. OPEA cites *Independent School Dist. No. 9 v. Glass*, 1982 OK 2, 639 P.2d 1233, 1237, for the proposition that "A violation of a state statute is an injury to the State and its citizens." [2] OPEA states that its members are citizens, that a violation of a statute has occurred, and it thus has standing.

¶ 9 We have said that an association possesses standing to seek relief on behalf of its members. *Independent Finance Institute v.*

*Clark*, 1999 OK 43, n. 7, 990 P.2d 845, 849. In *Independent Finance Institute* we relied upon *Private Truck Council of America, Inc., v. Oklahoma Tax Commission*, 1990 OK 54, ¶ 31, 806 P.2d 598, 607, vacated and remanded on other grounds by *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 501 U.S. 1247, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991), and we explained that an association's standing was based, in part, upon an injury to a right possessed by a member of the association:

> The Supreme Court of the United States "has recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity." In determining whether an association has standing, the United States Supreme Court has:
>
> > recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Private Truck Council of America, Inc.*, 1990 OK 54, 806 P.2d at 607.

■ Thus an association's standing is based upon members of that association possessing standing to sue in their own right.[3] Do members of the OPEA possess standing? We conclude that they do.

---

**2.** We note that in *Glass* the Court determined that a school district possessed standing to challenge an alleged illegal ad valorem tax refund affecting the revenue of that district. The Court relied upon *School Dist. No. 74 v. Long*, 1894 OK 38, 37 P. 601, where we determined that School District No. 74 was legally charged with maintaining the schools in the district, and the clerk's acts in removing property from the tax rolls, with the decrease in dedicated revenue to the school, would necessarily result in an injury to the district by affecting its ability to carry out its legal obligation. *See, Glass*, 639 P.2d at 1238; *Long*, 37 P. at 601–602.

**3.** DHS raises, by a footnote in its appellate brief, that the OPEA fails to satisfy the second prong of the test for the standing of an association. DHS

states, without citation of authority, or to the record on appeal, that the OPEA "is an organization of public employees whose purpose is to protect their rights as employees" and that the suit is not germane to this purpose. The trial court adjudication occurred in the context of motions for summary judgment. Those motions do not identify any facts relating to the purpose of the OPEA as either contested by, or agreed to, by the parties. Generally, on an appeal this Court does not make first instance determinations on disputed questions of fact or law. *Martin v. Johnson*, 1998 OK 127, 975 P.2d 889, 897. We decline to rule on the purpose of the OPEA without a trial court record showing that the fact was made an issue by the parties for trial court adjudication.

■ ¶ 10 The standing of the OPEA is based in this case on the status of its members as *taxpayers* challenging an alleged *illegal expenditure of public funds.* Four years before Statehood this Court examined opinions in different jurisdictions, and concluded that a *taxpayer* should be allowed to seek relief in a court of equity to challenge *illegal taxation* or *illegal expenditure* of public funds. *Kellogg v. School Dist. No. 10 of Comanche County*, 1903 OK 81, 74 P. 110, 116. We have followed this conclusion in subsequent years. *See, e.g., Thompson v. Haskell*, 1909 OK 140, 102 P. 700, 704; *Airy v. Thompson*, 1931 OK 770, 6 P.2d 445, 447–448; *Payne v. Jones*, 1944 OK 86, 146 P.2d 113, 117; *Brandon v. Ashworth*, 1998 OK 20, 955 P.2d 233, 235; *Quinn v. City of Tulsa*, 1989 OK 112, 777 P.2d 1331, 1340. Thus, a taxpayer possesses standing to seek equitable relief when alleging that a violation of a statute will result in an illegal expenditure of public funds or the imposition of an illegal tax.

¶ 11 DHS states that taxpayers may bring suit against a municipal corporation, but not an agency of State government. This Court addressed this argument at length in *Vette v. Childers*, 1924 OK 190, 228 P. 145, where we explained that the principle in *Kellogg* applied to taxpayers seeking to challenge the unlawful or unconstitutional expenditure of state funds.

> *Thompson et al. v. Haskell, Governor,* supra, [1909 OK 140, 24 Okla. 70, 102 P. 700] therefore, does not support the contention of the defendants in error, and the rule announced in the Kellogg Case has never been overruled.... We are of the opinion that the correct rule is announced in *Fergus v. Russel*, 270 Ill. 304, 110 N.E. 130, Ann.Cas. 1916B, 1120, in the first syllabus, as follows:
>
> "Because of their equitable ownership of the funds in the state treasury, and their liability to replenish the treasury for a deficiency which would be caused by a misappropriation, taxpayers may maintain a bill in equity to restrain the payment from the state treasury of moneys appropriated by the General Assembly on the ground that such appropriations are un-

constitutional; there being no distinction between suits to restrain the payment of funds from a municipal treasury and a suit to restrain payments from the state treasury, as a municipality, in exercising the delegated authority to raise funds by taxation, is exercising a part of the power of the state, and the sovereignty of the state is no less involved, except in degree, in a taxpayer's suit to enjoin the misappropriation of the funds of a municipality than in a suit to enjoin the misappropriation of the public funds in the state treasury."

> **The unlawful appropriation of public funds is an invasion of the legal rights of a taxpayer, and a suit may be maintained to restrain the expenditure of funds under an unlawful appropriation, without waiting for the state officers to take further steps toward the expenditure of the funds appropriated.**

*Vette v. Childers*, 1924 OK 190, 228 P. 145, 146, (citation and emphasis added).

Respondents' argument limiting the scope of *Kellogg* to non-State governmental entities is without merit.

¶ 12 DHS states that the interests of the members of the OPEA are common to the population at large, and the members should not possess standing to challenge the acts of state officials. It is certainly true that in some circumstances where a state statute is violated the plaintiff, regardless of taxpayer status, must seek relief for an injury specific to that individual that is not shared with the public at large. For example, some of our opinions discuss standing where taxpayers allege a violation of a state statute, *but they do not also allege an illegal tax or public expenditure.*

¶ 13 In *Bird v. Willis*, 1996 OK 116, 927 P.2d 547, where a citizen claimed that a state official violated a statute when issuing a liquor license to another individual, we said with regard to the plaintiff's standing that "an individual must have a particular interest of his own, independent of that interest which he may hold in common with other people." *Id.* 927 P.2d at 552. *Accord, Macy v. Oklahoma City School Dist. No. 89*, 1998 OK 58, ¶ 14, 961 P.2d 804, 807, (taxpayers could not, as taxpayers, bring a declaratory

judgment to invalidate an election). *Cf. Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, 890 P.2d 906, 914, (cause remanded to trial court for an adjudication of plaintiff's standing based upon a showing that plaintiffs were aggrieved and injured by the challenged governmental action).

¶ 14 In addressing plaintiffs' standing as taxpayers, in *McFarland v. Atkins,* 1979 OK 3, 594 P.2d 758, we explained that they could not successfully bring the suit where the Department of Health had express statutory authority to contract with a non-governmental agency to provide certain services. *Id.* 594 P.2d at 762. Similarly, we recently indicated that a taxpayer's standing in an election contest is different from that of a taxpayer's standing when challenging an illegal tax in an equitable proceeding. *Macy,* 1998 OK 58, ¶ 23, 961 P.2d at 810. These opinions show a distinction we made many years past in *Town of Afton v. Gill,* 1916 OK 393, 156 P. 658.

> In *Thompson v. Haskell,* 24 Okl. 70, 102 Pac. 700, this court made the limitation of the rule clear. It was there held that the rule does not permit private individuals to restrain public officials to correct purely public wrongs, but restricts the right of a private individual to that class of cases which involves the creation of debts illegally against, or the wrongful expenditure of the moneys of, the taxpayers.

*Town of Afton v. Gill,* 1916 OK 393, 156 P. 658, 661, *explaining, Thompson v. Haskell,* 1909 OK 140, 102 Pac. 700.

Likewise, in *Payne v. Jones, supra,* we said.

> We are committed to the rules that a resident taxpayer, although he shows no special or private interest, may maintain an action to enjoin the illegal creation of a public debt or an illegal expenditure of public funds (Syllabus by the court) *Id.* at 115, 117.

In sum, the members of the OPEA, as taxpayers, possess standing to challenge an alleged wrongful expenditure of public funds, and thus, the OPEA possesses standing to seek injunctive relief to prevent an alleged unlawful expenditure of those funds.

## II. Standing of Individuals

■ ¶ 15 DHS and Central Services further argue that the non-OPEA-members as individuals lack standing to bring the suit. The individuals are family members, guardians, or parents of residents at Greer Center. First, we note that "The voluntary placement of a child in an institution for the mentally retarded by the child's parents shall not, by itself, abrogate the rights and authority of the parents." 10 O.S.1991 § 1415(A). Further, in facilities operated by the Department of Human Services all residents of institutions for the mentally retarded "who are eighteen (18) years of age or older shall have a guardian appointed by a court." *Id.* at § 1415(B). However, in some cases after an assessment is performed the appointment of a guardian is not warranted and a guardian is not appointed. *Id.* at § 1415(C). DHS does not challenge the status of the parents and guardians as proper representatives of the residents of Greer.

¶ 16 DHS states that the individuals do not possess standing because (1) they have not demonstrated that any resident has suffered an actual or imminent injury in fact; (2) they have not demonstrated an injury to themselves; and (3) taxpayer status is insufficient. We have stated the following:

> A party whose standing is challenged must show (1) actual or threatened injury, (2) for which relief can be given, and (3) the interest to be protected is "within a statutorily or constitutionally protected zone". *In re Initiative Petition No. 363,* 1996 OK 122, ¶ 13 n. 29, 927 P.2d 558, 565 n. 29. The interest must be "direct, immediate and substantial". *Underside v. Lathrop,* 1982 OK 57, ¶ 7, 645 P.2d 514, 517.

*Brandon v. Ashworth,* 1998 OK 20, ¶ 6, 955 P.2d 233, 235.

■ In applying this standard we have explained that a suit may be brought challenging the legality of government action, or inaction, and if the plaintiff is the object of the action at issue, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, 890 P.2d 906, 912.

Further, "there [must be] some causal connection between the alleged injury and the actions being challenged." *Herring v. State ex rel. Oklahoma Tax Commission,* 1995 OK 28, 894 P.2d 1074, 1076, *quoting, Seal v. Corporation Commission,* 1986 OK 34, 725 P.2d 278, 283, *appeal dismissed sub nom., Amerada Hess Corp. v. Corporation Commission,* 479 U.S. 1073, 107 S.Ct. 1265, 94 L.Ed.2d 126 (1987).

¶ 17 The first challenge by Defendants states that the residents of the Greer Center have not, and will not, suffer an injury. Parents and guardians alleged that the non-government entity selected to operate the Greer Center, Liberty Healthcare, would not be able to operate the Center without additional staff and employees. They alleged that the additional staff that would probably be selected from employees employed at NORCE. They also alleged that these employees "may not be adequately trained or skilled to provide the care necessary to residents of the Greer Center who, unlike NORCE residents, are dually diagnosed."

¶ 18 DHS responded to the motion for summary judgment, and stated that the quality of care for the residents would remain in the control of DHS. DHS pointed to the following provisions of its final agreement:

1. DHS has the sole authority to discharge or admit residents, and Liberty must accept all DHS referrals.

2. DHS' Office of Client Advocacy is in charge of all residents' disputes, and actions in response to investigations must be approved by DHS.

3. DHS has the right to request the termination of any employee at Greer Center; Liberty must give DHS two weeks notice before replacing any key member of the Greer Center Staff.

4. DHS may immediately terminate the contract if it determines that the health and/or safety of any resident is endangered by the actions or inactions of Liberty.

5. All payments, including federal funds, third party payments, and payments from residents for Greer Center are the property of DHS.

6. DHS holds the Intermediate Care Facility for the Mentally Retarded License for Greer Center.

7. Liberty must operate the facility in accordance with the established policies of DHS and the Developmental Disabilities Service Division.

8. DHS continues to own the realty, facilities, equipment, and furniture of Greer Center.

9. The general maintenance of the facilities rests with DHS.

10. DHS shall have full and free access to observe and inspect Liberty's operation of the Greer Center at any time, without notice.

Response, at 12, citations to contract omitted.

In sum, Plaintiffs' motion for summary judgment alleged that the care of the residents may suffer because of the agreement, and DHS responded stating that it would monitor the care of the residents for the purpose of fulfilling its obligation to provide for the health and welfare of the residents, i.e., that the care of the residents would not suffer. Plaintiffs replied to Defendants' response, but did not discuss the quality of care to be received by the residents.[4]

¶ 19 The summary judgment process does not reveal any facts in support of the proposition that the care of the residents of Greer Center would suffer as a result of the outsourcing agreement. Plaintiffs do not point to any such facts in their appellate briefs. The parties have not identified any particular medically recognized standard of treatment that the DHS has, or will, fall short of in delivering treatment to the residents under the contract with Liberty. Further, the parties do not articulate any legal duty or standard of conduct specifically on the degree of

---

4. We have said that a patient in a mental hospital has a constitutional right to meaningful treatment. *In re K.K. B.,* 1980 OK 7, 609 P.2d 747, 749. Assuming, but not deciding, that a similar right is possessed by the residents and may be championed by their parents and guardians, no allegations were made, or facts produced during the summary adjudication process, relating to any particular treatment of the residents as warranting a legal remedy.

care required by DHS in providing for the residents.

■ ¶ 20 An injunction is used to prevent future misconduct, but an injunction should be denied when the expectation of future wrongdoing is too speculative to form the basis for issuing an injunction. *Quinn v. City of Tulsa,* 1989 OK 112, 777 P.2d 1331, 1341. *Accord, Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), *discussing, Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), (there are circumstances in which the prospect that a defendant will engage in harmful conduct may be too speculative to support standing for injunctive relief). Defendants suggest that any claim of injury is speculative.

■ ¶ 21 In *Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, 890 P.2d 906, we required the trial court to determine standing after the cause was remanded to that court. The record on appeal here does not show any adjudication on the specific standing claim of the parents and guardians that injury would occur to the residents. Further, nothing in the record on appeal shows any adjudication on Defendants' assertions that the claim of injury is speculative. The party invoking a court's jurisdiction has the burden of establishing his or her standing (when contested) to pursue the action in court. *Toxic Waste Impact Group, Inc. v. Leavitt,* 1994 OK 148, 890 P.2d 906, 910. Whether this burden is met must first be determined by the District Court. This Court will not exercise its appellate jurisdiction to make first instance determinations on disputed questions of fact or law. *Martin v. Johnson,* 1998 OK 127, 975 P.2d 889, 897. The trial court's judgment determining the standing of the parents and guardians, to the extent that it rests upon a disputed allegation of injury to the residents, cannot stand and must be reversed. Because the trial court did not previously adjudicate the standing of the parties based upon an allegation of injury to the residents, the parties may assert, and the trial court may adjudicate, such standing upon remand. *Toxic Waste Impact Group, Inc. v. Leavitt, supra.*

### III. Authority of DHS

■ ¶ 22 The Oklahoma Department of Central Services selected Liberty of Oklahoma Corporation to manage the Greer Center. Does the Department of Human Services possess the authority to outsource or privatize [5] the operation of Greer Center **notwithstanding a lack of specific contractual authority to outsource?** DHS need not have specific authority if such outsourcing is necessary to perform its statutory duty to operate Greer Center.

¶ 23 The Oklahoma Constitution provides that "the Legislature and the people by initiative petition are hereby authorized to provide by appropriate legislation for the relief and care of needy aged persons who are unable to provide for themselves, and other needy persons who, on account of immature age, physical infirmity, disability, or other cause, are unable to provide or care for themselves; . . . ." Okla. Const. Art. 25 § 1.[6]

5. Language in the contract with Liberty states that it is "outsourcing" the management of the facility, and that this is not "privatization" because DHS continues to maintain the facility, "provide oversight of the operation of the Facility" and retain ownership of the property and equipment. We note that the parties do not address application of the Oklahoma Privatization of State Functions Act. The Act's effective date is January 1, 2000. 1999 Okla. Sess. Laws c. 281, § 6. The Act was codified with editorially renumbered sections at 74 O.S.Supp.1999 §§ 586–590. The Act defines "privatize" as entering into a contract for the performance of a duty or function which is currently being performed by a state employee. *Id.* at § 588. The Act requires certain procedures before a privatization contract is awarded. *Id.* at § 589. We decline to engage in a *sua sponte* discussion of when the Act applies.

6. Okla. Const. Art. 25 § 1:
§ 1. Relief and care of needy aged and disabled persons-Co-operation with Federal plan
In order to promote the general welfare of the people of the State of Oklahoma and for their protection, security, and benefit, the Legislature and the people by initiative petition are hereby authorized to provide by appropriate legislation for the relief and care of needy aged persons who are unable to provide for themselves, and other needy persons who, on account of immature age, physical infirmity, disability, or other cause, are unable to provide or care for themselves; Provided, the Legislature or the people by initiative

Our Constitution also specifies that the Department of Public Welfare (now Department of Human Services)[7] has the function of administering and carrying into execution all laws enacted by the Legislature and the People. Okla. Const. Art. 25 § 2.[8] These provisions state that legislative power resides in the Legislature and the People, and DHS must execute those laws created by either the Legislature or the People.

¶ 24 DHS argues that it possesses the constitutional authority to formulate specific policies on how it will perform those duties assigned to it by the Legislature and the People. DHS relies upon Okla. Const. Art. 25 § 4.[9] It points to the constitutional language stating that: "The Commission shall formulate the policies, and adopt rules and regulations for the effective administration of the duties of the Department." The constitutional power to formulate policies resides in the **Commission** for Human Services and not the Department of Human Services. The **Commission** may exercise a **legislative** power to formulate a policy while the **Director** of the Department exercises **executive** and **administrative** duties imposed upon the Department. Okla. Const. Art. 25 § 4. The Oklahoma Administrative Code (O.A.C.) states that "The Commission is responsible for formulating Department Policies and adopting rules and regulations for the effective administration of programs under the jurisdiction of the Department." O.A.C. 340:1–1–3(b) (1996). In summary, the Legislature and the People define the duties of the Department, Okla. Const. Art. 25 § 1, the Department carries out those duties, Okla. Const. Art. 25 § 1, the Commission creates policies and rules for the Department to carry out the duties of the Department, Okla. Const. Art. 25 § 4, and the Director possesses executive and administrative power to implement the policies and rules created

petition, are further authorized, in co-operation with and under any plan authorized by the Federal Government for State participation, to provide by appropriate legislation for the relief and care of aged or needy persons.

The levy of taxes, other than ad valorem taxes, necessary to carry into effect legislation enacted pursuant thereto, is hereby authorized.

7. The Department of Public Welfare is now the Department of Human Services, the Public Welfare Commission is known as the Commission for Human Services, and the Director of Public Welfare is the Director of Human Services. 56 O.S.1991 § 162.1. *See, e.g., City of Chandler v. State ex rel. Dept. of Human Services,* 1992 OK 137, n. 1, 839 P.2d 1352, 1353, (stating change of name); *State ex rel. Dept. of Human Services v. Malibie,* 1981 OK 18, 630 P.2d 310, 316, (same). An explanation of the change in name appears in those provisions of the Oklahoma Administrative Code describing the function and structure of the Department of Human Services. See O.A.C. 340:1–1–2(b) (1996): "In 1970, the Legislature authorized the Department of Public Welfare to operate as the Department of Institutions, Social and Rehabilitative Services and in 1980 changed the statutory name to Department of Human Services."

8. Okla. Const. Art. 25 § 2:
§ 2. Department of Public Welfare
For the purpose of effectively administering and carrying into execution all laws enacted pursuant to the authority granted in Section One hereof, there is hereby created a Department of Public Welfare. Said Department of Public Welfare is hereby charged with the duty and respon-

sibility of faithfully administering and carrying into execution all laws enacted pursuant to the authority granted in Section One hereof and shall perform such other duties as may, from time to time, be prescribed by law.

9. Okla. Const. Art. 25 § 4:
§ 4. Director of Public Welfare
It shall be the duty of the Commission to select a Director of Public Welfare, who shall not be a member of the Commission, and who shall serve as the executive and administrative officer of the Department of Public Welfare. The Director shall be appointed wholly on the basis of ability, training and experience qualifying him or her for public welfare administration. The Director shall serve at the pleasure of the Commission. The salary of the Director shall be fixed by the Commission.

The Commission shall formulate the policies, and adopt rules and regulations for the effective administration of the duties of the Department. All executive and administrative duties and responsibilities of the Department shall be discharged by the Director, subject to the approval of the Commission. Subject to the control of the Commission, the Director shall have the power and it shall be his duty to employ personnel of the Department, prescribe minimum standards of qualifications for such personnel and conduct examinations before employment, formulate salary schedules for classified service based upon training, experience and general ability of persons selected for positions in the Department or any institutions or activities under the supervision of the Department.

by the Commission.[10]

■ ¶ 25 DHS argues that Art. 25 § 4 vests DHS (or the Commission) [11] with legislative power apart from the Legislature or the people, and that this power includes the ability to perform certain acts not granted by the Legislature. The policies, rules, and regulations for DHS are for the administration of the **duties of the Department.** We said in *City of Sand Springs v. Department of Public Welfare,* 1980 OK 36, 608 P.2d 1139, "This mandatory constitutional requirement that the Commission formulate policies for the effective administration of its duties is indicative of a constitutional mandate from the people to the Commission **to legislate when necessary to accomplish effectively the duties imposed upon the body.**" *Id.* 608 P.2d at 1146. Public officials and agencies possess those powers granted by law, by constitution or statute, and those officials and agencies cannot expand those powers by their own authority. See *Marley v. Cannon,* 1980 OK 147, 618 P.2d 401, where we said that an "agency created by statute may only exercise those powers granted by statute and cannot expand those powers by its own authority." *Id.* 618 P.2d at 405. The duties of the Department are not created by DHS, but by the People and the Legislature, Okla. Const. Art. 25 § 1, and implemented in accordance with the rules of the Commission, Okla. Const. Art. 25 § 4.

¶ 26 DHS further argues that while the Legislature may determine that caring for these children is a duty of DHS, the decision of how DHS cares for them, either through employees or independent contractors, is a decision made by DHS. DHS relies upon *City of Sand Springs v. Department of Public Welfare, supra,* where one issue was whether DHS had authority to build an institution. We first determined whether DHS had statutory authority to build a detention facility on the grounds of an institution operated by DHS. We noted that a statute gave express authority to DHS for "capital outlay", that this Court had previously equated "capital expenditure" with "capital outlay", and that "[t]he language of the statute ... clearly authorizes the Commission to construct a capital improvement whenever the Commission finds the improvement necessary for the discharge of its responsibilities imposed by statute." *Id.* 608 P.2d at 1144. We then discussed a legislative function of the Commission (and thus DHS) contained in Art. 25 § 4:

This mandatory constitutional requirement that the Commission formulate policies for the effective administration of its duties is indicative of a constitutional mandate from the people to the Commission **to legislate when necessary to accomplish effectively the duties imposed upon the body.** This Court has committed itself to the proposition that the essence of the legislative function is the determination of policy; indeed, the dichotomy between administrative acts and legislative acts hinges upon the declaration of policy, which is a legislative function, and the implementation of that policy, which is traditionally an administrative function. See *Wells v. Childers,* 196 Okl. 353, 165 P.2d 371 (1945), *School District # 25 of Woods County v.*

---

10. Generally, every positive delegation of power by the Constitution to one officer or department of government implies a negation of its exercise by any other officer or department. *Board of Regents of University of Oklahoma v. Baker,* 1981 OK 160, 638 P.2d 464, 466. No policy of the Commission is before us, and we are thus not called upon in this controversy to define with precision the scope of Art. 25 § 4 "policies" created by the Commission with respect to Art. 25 § 1 duties determined by the Legislature and the People.

11. The argument of DHS based upon its possession of a legislative power is addressed here as if DHS is asserting the Commission's legislative power as a justification for the challenged activity. As we indicate herein, the constitutionally created legislative power is vested in the Commission and not the Department or its Director. A particular power vested by the Oklahoma Constitution may be nondelegable, and nothing in Article 25 suggests that the Commission's constitutionally created legislative power is to be shared with the Department and its Director. For an example of a constitutionally created nondelegable power see, *State ex rel. Oklahoma Bar Association v. Downing,* 1990 OK 102, 804 P.2d 1120, 1122, 1123, where we said that the Supreme Court possesses a nondelegable constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law.

*Hodge,* 199 Okl. 81, 183 P.2d 575 (1947), *State ex rel. and Hart v. Parham, supra* [412 P.2d 142 (Okla.1966)]. Under Article XXV, Section 4 of this State's Constitution, **the only limitation upon the Commission's rule-making ability is that they be made in furtherance of the department's duties as provided by law.**

We are therefore constrained to hold the people of the State of Oklahoma, by passing Article XXV §§ 2 and 4 at a Constitutional referendum vote, have removed the prohibition against delegation of legislative authority to the Welfare Department. **The remaining criteria by which to measure the authority of the Commission to act is: Was the questioned action in furtherance of the Department's duties as provided in Oklahoma Constitution, Article XXV § 4:** "The Commission shall formulate the policies, and adopt rules and regulations for the effective administration of the duties of the Department."? Was the decision to construct the institution done in furtherance of a duty placed upon the Department?

*Id.* 1980 OK 36, at ¶¶ 12–13, 608 P.2d at 1146, emphasis added.

We then noted that DHS had a statutory duty to "shelter" certain children, and that the construction was for this purpose. The construction was designed to fulfill a statutory duty. *Id.* 608 P.2d at 1147. The construction was a lawful exercise of power by the Commission because it was "necessary to accomplish effectively the duties imposed upon the body [the Commission]." *Id.* 608 P.2d at 1147.

 ¶ 27 Public officers possess only such authority as is granted by law, and that authority must be exercised in the manner provided by law. *Tulsa Exposition & Fair Corp. v. Board of County Commissioners of Tulsa County,* 1970 OK 67, 468 P.2d 501, 507–508; *Brown v. State Election Bd.,* 1962 OK 36, 369 P.2d 140, 144. We recognize that generally, an officer or agency has, by implication and in addition to the powers expressly given by Constitution or statute, such powers as are necessary for the due and efficient

exercise of the powers expressly granted, or such as may be fairly implied from the constitutional provision or statute granting the express powers. *Marley v. Cannon,* 1980 OK 147, ¶ 10, 618 P.2d 401, 405, (necessary powers are implied from express power granted by statute); *H.F. Wilcox Oil & Gas Co. v. Walker,* 1934 OK 280, 32 P.2d 1044, 1046, (authority of the Corporation Commission is limited to the power expressly or by necessary implication granted to it by the Constitution and the statutes).[12]

¶ 28 In *Oklahoma City v. State ex rel. Marland,* 1944 OK 37, 145 P.2d 418, we explained that:

We are of the opinion that **under the express powers granted by the constitution and pertinent statutes** relating to the sale and disposal of public lands, the platting of the same for townsites or additions to towns and the sale of town lots, **there was necessarily implied the power** to lay out streets, and alleys, and parkways, to dedicate to public use an easement for such purposes. Insofar as streets and alleys are concerned, it is necessary that such be provided or townsites or additions to towns would not be practicable or even possible.

*Oklahoma City v. State ex rel. Marland,* 145 P.2d at 420, (emphasis added).

These opinions tell us to examine relevant express and implied authority to determine if the challenged conduct is permitted. This is what we did in *City of Sand Springs* when we noted the express statutory authority for DHS to make capital expenditures, and the implied authority of DHS to perform that which was necessary to accomplish effectively the duties expressly imposed upon the Commission. *City of Sand Springs,* 608 P.2d at 1144, 1147.

¶ 29 DHS is statutorily charged with the responsibility of operating NORCE. 10 O.S.Supp.1992 §§ 1406, 1409. This duty may not be re-delegated by DHS to some other entity. The applicable maxim is *delegata potestas non potest delegari,* delegated authority cannot be re-delegated. *Bushert v.*

---

**12.** The Legislature may expressly grant an implied power. *See, e.g.,* 17 O.S.2001 § 153 (Corporation Commission); 36 O.S.2002 § 332 (State Board for Property and Casualty Rates).

*Hughes*, 1996 OK 21, 912 P.2d 334, 339; *State ex rel. Oklahoma Bar Association v. Livshee*, 1994 OK 12, n. 13, 870 P.2d 770, 773.[13] We previously observed that DHS: 1. discharges and admits patients, 2. is in charge of residents' disputes, 3. may cause the termination of employees, 4. may terminate the contract if the health or safety of residents is endangered by Liberty, 5. owns certain payments, 6. holds the license for the facility, and 7. continues to own and provide general maintenance for the facility.

¶ 30 Two characteristics of the contractual arrangement are important: 1. Liberty must operate the facility in accordance with the established policies of DHS and the Developmental Disabilities Service Division, and 2. DHS shall have full and free access to observe and inspect Liberty's operation of the Greer Center at any time, without notice. DHS cannot re-delegate its statutory duty of operating the facility to another, and thus DHS must have established policies for Liberty's management to follow so that DHS performs its statutory duty through the acts of Liberty and Liberty's employees. The creation of those policies by DHS and the exercise of the power to observe and inspect Liberty for compliance with those policies is required to prevent DHS from delegating its statutory duty to Liberty.

¶ 31 The Commission possesses a general constitutional authority to adopt rules for the duties imposed on the Department, and a specific statutory authorization and direction to "to promulgate and adopt all rules and regulations necessary to carry out the provisions of this act." 10 O.S.1991 § 1411(a).[14] The Greer Center Facility is located on the grounds of NORCE in Enid, is a separate entity from NORCE, and the statute provides additional criteria for a person's admission, evaluation and assessment, and discharge procedure. 10 O.S.Supp.1997 § 1414.1 The Commission for Human Services is "authorized and hereby directed to promulgate and amend rules necessary to implement the provisions of this section." *Id.* at § 1414.1(J).

¶ 32 The Legislature formulates and then expresses policy of the State via its written legislative enactments. *Stewart v. Harris*, 1967 OK 223, 434 P.2d 902, 905; *State v. Mathews*, 1928 OK 751, 273 P. 352, 358. The Commission possesses a constitutionally granted legislative power to formulate a policy and declare or express it via its written enactments in the form of rules for the Department. See *City of Sand Springs v. Department of Public Welfare*, 608 P.2d at 1146, where we said that "This Court has committed itself to the proposition that the essence of the legislative function is the determination of policy; indeed, the dichotomy between administrative acts and legislative acts hinges upon the declaration of policy, which is a legislative function, and the implementation of that policy, which is traditionally an administrative function." No party points to any rule promulgated by the Commission (or DHS) relevant to outsourcing management at institutions placed under the authority of DHS by the Legislature. DHS states that no rule is needed because its decision to outsource is an internal management decision.

¶ 33 DHS relies upon *City of Sand Springs v. Department of Public Welfare*, *supra*, for the proposition that "decisions like the one made in *Sand Springs*" ... "need not be made pursuant to the formal rulemaking procedures of the APA." In *City of Sand*

---

**13.** In *H.F. Wilcox Oil & Gas Co. v. Walker*, 1934 OK 280, 32 P.2d 1044, we said that the maxim prohibiting the delegation of power has some qualifications, one of which occurs in the context of an administrative board exercising a legislative power. This qualification requires the legislative power of the board to be guided by procedural and substantive limits set by the Legislature. *Id.* at 1047. *See also Democratic Party of Oklahoma v. Estep*, 1982 OK 106, 652 P.2d 271, 276 (legislative standards are necessary for delegated legislative power). The parties do not rely upon any rule or procedure of the Commission, or point to any legislative standards created by the Legislature or the People, and this exception to the maxim is not before us for application.

**14.** The phrase "this act" refers to statutes originally enacted in 1963 (1963 Okla. Sess. Laws, Ch. 37), later codified at 56 O.S.1981 §§ 301–318, and then renumbered in 1982 (1982 Okla. Sess. Laws, ch. 312), and codified at 10 O.S.1991 §§ 1406, 1408, 1409, 1410, 1411, 1412, 1413, 1414, 1415, 1416, and 1417.

*Springs* we relied upon former 75 O.S.1971 § 301 for the proposition that not every decision made by the DHS must be in the form of a rule because a "rule" does not include "statements concerning only the internal management of an agency and not affecting private rights...." *City of Sand Springs,* 608 P.2d at 1152. Similar language was in the Administrative Procedures Act at the time the contract with Liberty was created.[15] We agree that 75 O.S.Supp.1999 § 250.3 does not require every agency decision to be in the form of a rule. But an exercise of power by an agency must be pursuant to either an express or implied power granted by law. *Tulsa Exposition & Fair Corp. v. Board of County Commissioners of Tulsa County, supra; Brown v. State Election Bd., supra.*

¶ 34 The Director of the Department possesses constitutional authority to employ personnel and set standards for that employment.[16] No one in this controversy disputes that authority. Nor does anyone question the authority of a state agency to curtail the employment of individuals from that agency, or to abolish particular or individual employment positions in a state agency. A state agency possesses the authority to decrease the number of employees employed at that agency and remove employment positions by using the State Government Reduction in Force and Severance Benefit Act. 74 O.S.Supp.1997 § 840–2.27A § 840–2.27H. The record on appeal states that employees were provided a statutory benefit package for those deciding to voluntarily terminate their state employment prior to the outsourcing. See 74 O.S.Supp.1999 § 840–2.28. Clearly, a state agency may reduce the number of its employees.

¶ 35 May a state agency exercise internal management discretion and determine to perform its constitutional or statutory duty using an independent contractor? Again, the answer depends upon whether the agency possesses express or implied authority to make such a decision in a particular circumstance. Generally, the Oklahoma Legislature has anticipated that a state agency may use an independent contractor to provide services to a state agency. The Oklahoma Legislature adopted the Central Purchasing Act, 74 O.S.1991, § 85.1 et seq., as amended, to govern the expenditures of the various governmental agencies in acquiring goods or services, and unless exempted by the Legislature, the Act applies to DHS. *Indiana Nat. Bank v. State Dept. of Human Services,* 1993 OK 101, 857 P.2d 53, 60, 63–64. That Act provides procedures for a state agency's acquisition of items, products, supplies, **services,** or equipment. 74 O.S.Supp. 1999 § 85.2(A), (emphasis added).

¶ 36 Plaintiffs argue that DHS may not outsource the management of its institutions unless a statute specifically grants that authority. They argue that the Legislature has given such authority to certain agencies, but not to DHS for managing these institutions.[17] NORCE and the Greer Center are institutions that were transferred to the control of DHS from the Board of Mental Health and Substance Abuse Services, and contracts made by that Board were binding upon DHS. 10 O.S.1991 § 1410. While § 1411 provides authorization for the expenditure of funds for certain broad categories, such as repair of buildings, "land and other capital outlay," none of the statutes relating specifically to NORCE and Greer contain language vesting contractual powers in DHS for administering these institutions.[18] The Legislature has

---

15. 75 O.S.Supp.1999 § 250.3(15), (c), states, in part, that a "rule" does not include "statements and memoranda concerning only the internal management of an agency and not affecting private rights or procedures available to the public ..."

16. *See* Okla. Const. Art. 25 § 4, at note 10, *supra.*

17. Plaintiffs argue that outsourcing management is statutorily authorized by 74 O.S.Supp.1998 §§ 1803.1 & 1803.1a, (Oklahoma Tourism and

Recreation Commission's authority over the Quartz Mountain Arts and Conference Center and the Texoma Lodge); 10 O.S.Supp.2000 § 7304–1.3(C)(4) and (C)(3)(c) (contracts relating to for juvenile detention facilities); 63 O.S.Supp. 2000 § 3203, 3226 (University Hospitals Authority Act); 3 O.S.Supp.1995 § 85(i), (Oklahoma Aeronautics Commission may enter into any contracts necessary to the execution of the powers granted it by this act).

18. Statute provides that the Greer Center Admissions Committee shall include "an independent psychologist or psychiatrist **on contract** with the

thus not given DHS *specific* contractual authority for every duty the Legislature has given to DHS. Thus contractual authority itself must be necessarily implied from the nature of the duty given to DHS. *Marley v. Cannon, supra.*

¶ 37 The Legislature has recognized certain contractual powers of DHS by focusing upon the terms of contracts that DHS enters into. For example, when DHS contracts pursuant to the State Medicaid Plan with facilities that provide certain inpatient or residential mental health services the Legislature has required such contracts to contain specific provisions. 56 O.S.Supp.1992 § 220d.[19] Further, the Legislature has recognized that DHS does contract for services in some instances, as when the Legislature makes statutory requirements for settling claims based upon such contracts. 56 O.S.Supp.1992 § 225.1.[20]

¶ 38 The Legislature has given DHS the duty of administering NORCE and the Greer Center, but without specifically vesting contractual powers in DHS for the performance of that duty. The Plaintiffs do not expressly challenge the authority of DHS to contract for some services for the benefit of the residents of Greer. Their attack upon the outsourcing is instead based upon the idea that DHS employees have customarily provided the management and operational services. The conclusion they appear to draw from this fact is that outsourcing cannot thus be "necessary," in the sense that historically the only implied powers possessed by an officer or board are those which are **necessary** for the effective exercise and discharge of the powers and duties expressly conferred and imposed. *See City of Wilburton v. King,* 1933 OK 61, 18 P.2d 1075, 1076–1077. We

Department of Human Services," but that language does not **expressly** authorize the Department to create such contracts. 10 O.S.Supp. 1997 § 1414.1(E), (emphasis added).

19. 56 O.S.Supp.1992 § 200d:

§ 200d. State Medicaid Plan provider contracts—Terms and conditions—Termination—Annual inspection of facilities

A. Every contract pursuant to the State Medicaid Plan entered into between the Department of Human Services and facilities that provide inpatient or residential mental health services to persons eighteen (18) years of age or younger who are or may be eligible for assistance through Title XIX of the federal Social Security Act shall incorporate terms and conditions for the care, treatment and services to be provided.

B. Said terms and conditions shall be substantially the same as those included in placement agreements for acute or freestanding, as appropriate for the facility, psychiatric care for children and youth who are in the legal custody of the Department of Human Services and shall include, but not be limited to:

1. Primary care, treatment and counseling services;
2. Educational services;
3. Face-to-face visitation by the attending physician, treatment plans, discharge planning, reports on the progress of the child and other reports as necessary and appropriate;
4. Use of medications;
5. Communicable diseases;
6. Visitation and correspondence;
7. Use of restraints, seclusion, physical force and disciplinary measures; and
8. Inspections and reviews of the care, treatment and services provided.

C. The Department shall immediately initiate procedures for the termination of said contract when:
1. A contracting facility continually violates the terms and conditions required by this section; or
2. The conditions within the facility pose serious harm or a threat of serious harm to patients or residents who are eighteen (18) years of age or under and have been admitted for the purpose of mental health or chemical dependency treatment.

D. The Department shall coordinate with the State Department of Health and any other applicable licensing or certifying agency to ensure that, whenever possible and practicable, annual inspections of hospitals, related institutions and child care facilities required by state or federal law shall be conducted jointly.

20. 56 O.S.Supp.1992 § 225.1:

§ 225.1. Records regarding agreements or authorization to settle claim for reconciliation purposes for contracts or purchases

A. The Department of Human Services shall maintain detailed records regarding any agreements or authorizations to settle a claim made for reconciliation purposes for any contract or purchase of materials, items, supplies or services. Such records shall include but not be limited to identification of parties involved in the reconciliation, identification of materials, items, equipment or services at issue, among originally due and owing and amount of settlement.

B. Any settlement made for purposes of reconciliation for any contract or purchase of any materials, items, equipment or settlement shall be approved in writing by the administrative head of the division making such settlement and by the Director of the Department of Human Services.

disagree with Plaintiffs' interpretation that defines what is necessary to operate a state agency by what has customarily been performed in a different time and under perhaps different circumstances. For example, the appellate record states that the laundry of the clients is done on the premises, but linens and other laundry are outsourced. The laundry building at NORCE is vacant and used for storage because "it is more economical" to outsource the laundry. Plaintiffs' view of DHS contractual authority, if applied consistently, is that outsourcing services such as laundry are improper. Plaintiffs' interpretation of DHS contractual authority requires every service a client receives at Greer to be provided by a state employee, unless Greer has historically provided the service by other means. Implied or necessary authority thus becomes defined by what has occurred, as opposed by what is necessary in a given set of circumstances.

¶39 The trial court issued an injunction and determined two issues, that Plaintiffs possessed standing and that the Legislature had not given "specific authority" to DHS to outsource. We agree that plaintiffs as taxpayers possessed standing. We must reverse the decision of the trial court as to the standing of the parents and guardians, apart from taxpayer status, because of the unresolved issue of fact. When the Legislature has created a duty on the part of DHS without specifically stating the contractual authority of DHS, whether DHS possesses a particular contractual authority is dependent upon whether that contractual authority is necessary [21] to perform the duty given to DHS. This issue was not litigated in the District Court. The statutory lack of "specific authority" for an agency's contractual authority is not determinative of that agency's contractual authority. The District Court injunction against DHS is thus reversed.

The judgment of the District Court is thus affirmed in part and reversed in part, and the matter remanded to the District Court for further proceedings consistent with this opinion.

¶40 HARGRAVE, C.J., HODGES, LAVENDER, OPALA, KAUGER, JJ., Concur.

¶41 WATT, V.C.J., Concurs in Parts I & II; Dissents in Part III.

¶42 BOUDREAU, J., Concurs in Parts I & II; Concurs in Result in Part III.

¶43 WINCHESTER, J., Concurs in Part I; Dissents in Parts II & III.

¶44 WINCHESTER, J., Concurring in part and dissenting in part.

I concur in Part I. I dissent to Part II because the parents have standing as taxpayers. I dissent to Part III. The provisions to the final agreement in the management contract provide for such control by DHS that the managing company could not even be considered an independent contractor.

---

21. In determining what is "necessary" for DHS to perform its duties the trial court might consider (1) whether the Legislature provided a mechanism for DHS to follow, *Okla. Tax Comm. v. Fortinberry,* 1949 OK 75, 201 Okla. 537, 207 P.2d 301, (2) whether the statutes and their history relating to DHS and Greer Center suggest that an implied power is part of a statutory scheme, *City of Hugo v. State ex rel. Public Employees Relations Bd.,* 1994 OK 134, 886 P.2d 485, 492,

(3) whether withholding outsourcing power from DHS would be inconsistent with the purpose of some constitutional or statutory provision, *Board of Examiners of Veterinary Medicine v. Tubbs,* 1957 OK 13, 307 P.2d 830, or (4) whether the Legislature appropriated funds for the expenditure of outsourcing at Greer Center, *Lingo–Leeper Lumber Co. v. Carter,* 1932 OK 735, 161 Okla. 5, 17 P.2d 365.