STATE of Oklahoma ex rel.
DEPARTMENT OF HUMAN
SERVICES, Petitioner,

v.

Ernest W. MALIBIE, Jaydene Morrison, Everett A. Hadwiger, Members of the County Excise Board of Alfalfa County et al., Respondents.

No. 56005.

Supreme Court of Oklahoma.

Feb. 18, 1981.

· Thomas H. Tucker and Russell D. Hall, Dept. of Human Services, Oklahoma City, for petitioner, Dept. of Human Services.

Jan Eric Cartwright, Atty. Gen., Manville T. Buford, Asst. Atty. Gen., Oklahoma City, for amicus curiae, Atty. Gen. of Oklahoma.

Dist. Attys. of Alfalfa County, Atoka County, Beaver County, Beckham County, Bryan County, Carter County, Cimarron County, Cleveland County, Coal County, Cotton County, Craig County, Greer County, Harmon County, Harper County, Jackson County, Johnston County, Kingfisher County, Kiowa County, LeFlore County, Logan County, Love County, McClain County, Mayes County, Murray County, Oklahoma County, Okmulgee County, Osage County, Ottawa County, Pawnee County, Payne County, Pontotoc County, Roger Mills County, Sequoyah County, Stephens County, Tillman County, Tulsa County, and Woods County, for respondents.

BARNES, Vice Chief Justice:

In early 1980, State Representative Joan Hastings wrote the Attorney General of the

State of Oklahoma, the Honorable Jan Eric Cartwright, requesting an official Attorney General's Opinion. In that request, Representative Hastings asked the Attorney General whether six separate statutes, all involving the expenditure of county funds, violated the Oklahoma Constitution. The Attorney General, in accordance with the mandatory duty imposed upon him by virtue of 74 O.S. Supp.1979 § 18b,[1] issued a formal written opinion—Attorney General's Opinion No. 80–63—taking the position that five of the Acts in question were constitutional. However, the Attorney General opined that Section 175.11 of Title 10 violated the provisions of Article 10, Section 9, of the Constitution, as it required county ad valorem tax revenues to be spent for State purposes.

The statute found to be unconstitutional, 10 O.S. 1971 § 175.11, requires that counties appropriate at least one-fifth (⅕) of one mill on the assessed valuation of the respective counties to the Crippled Children's Program, providing:

"It *shall be the mandatory duty of the board of county commissioners of each county of the State of Oklahoma to include in their respective estimates, and of the excise board of each county of the State of Oklahoma to appropriate for each fiscal year hereafter a sum equal to not less than the net proceeds of one-fifth (⅕) of one mill on the assessed valuation of their respective counties.* Said appropriation is to be included within the regular county general fund appropriation for current expenses and set aside to care for the children accepted by the Commission upon application by the respective county welfare director as provided in Section 175.10 of this Title. *This appropriation shall be known as the Crippled Children's Budget Account, and it shall be unlawful to use said budget account for any purposes other than those authorized in this Act.* Money shall be paid out of this budget account upon certification and approval of the claim by the Director. No county shall be liable for any charges beyond the respective Crippled Children's Budget Account of the fiscal year and no more than twenty percent (20%) of the Crippled Children's Budget Account of any one county may be expended for any one patient during any fiscal year. Claims filed by the Commission for payment by the county shall be sent to the respective county clerk and shall be allowed by the respective board of county commissioners if the same are found to be in keeping with the provisions of this Act. In the administration of this Act, the Commission shall require all unencumbered funds in the county's Crippled Children's Budget Account be encumbered and made available for the benefit of the child, who is a resident of said county, within the limitations of this Act, as above set out, before making other State or Federal appropriated funds available for the care of said child." [Emphasis added]

The constitutional provision found to be violated by the statute, Article 10, Section 9, provides in part that:

"No ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes."

Relying upon the Attorney General's Opinion, many County Commissioners and members of County Excise Boards failed to

---

I. Title 74 O.S. Supp.1979 § 18b, which sets. forth various duties of the Attorney General, states in part that the duties of the Attorney General of the State shall be:

"* * *

"(e) To give his opinion in writing upon all questions of law submitted to him by the Legislature or either branch thereof, or by any state officer, board, commission or department, provided, that the Attorney General shall not furnish opinions to any but district attorneys, the Legislature or either branch thereof, or any other state official, board, commission or department, and to them only upon matters in which they are officially interested.

"* * *

"(q) To respond to any request for an opinion of his office, submitted by a member of the Legislature, regardless of subject matter, by written opinion determinative of the law regarding such subject matter."

comply with provisions of Title 10 § 175.11, as that statute was found to be unconstitutional.

Arguing that 10 O.S. § 175.11 does not violate the Oklahoma Constitution, the Petitioner, Department of Human Services, now comes to this Court asking that we issue a Writ of Mandamus, requiring various County Commissioners and members of various County Excise Boards to comply with the provisions of that statute.

Because the power vested in this Court, under Article 7, Section 2, of the Oklahoma Constitution, includes general superintending control over all commissions and boards created by law, and because of the public nature of the controversy before us, we assume original jurisdiction to determine whether Title 10 § 175.11 violates the Oklahoma Constitution.

## I.

We begin our examination of this cause by reviewing past decisions of this Court dealing with legislative attempts to use county ad valorem tax revenues to finance State programs.

In 1917, the Legislature passed an Act known as the "Lunacy Law of 1917". That Act required that counties from which a public patient came were to pay for the support of the same public patient while incarcerated in the State Hospital. In *Board of Com'rs of Logan County v. State ex. rel. Short,* 122 Okl. 268, 254 P. 710 (1927), this Court, in ruling unconstitutional the provisions which required expenditure of county ad valorem taxes for the State programs, stated:

"The mandatory provisions of the Constitution of this state are that such insane hospitals shall be 'established and supported by the state.' [Referring to Article 21, Section 1, of the Oklahoma Constitution.] This is what the people, in adopting our Constitution, have said that the state shall do, and this, in our opinion, is exactly what the Legislature has undertaken to say the counties shall, and the state shall not, do. This being so, the act is undoubtedly void. The Constitu-

tion, of course, does not expressly inhibit the power the Legislature has assumed to exercise, but an express inhibition is not necessary. The affirmation of a distinct policy upon any specific point in a state Constitution implies the negation of any power in the Legislature to establish a different policy. * * * " [254 P. 710 at 711–712.]

In reaching this conclusion, the Court also considered what effect, if any, the last phrase in Article 21, Section 1, had upon the State's duty to establish and support certain institutions. Article 21, Section 1, of the Oklahoma Constitution, provides:

"Educational, reformatory, and penal institutions and those for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public good may require, shall be established and supported by the State *in such manner as may be prescribed by law."* [Emphasis added]

The State contended that the last phrase, " * * * in such manner as may be prescribed by law", enabled the Legislature to prescribe that counties should fund such programs out of ad valorem tax revenues. In rejecting this argument, this Court stated:

"Some contention is made that the words 'in such manner as may be prescribed by law,' at the close of article 21 of the Constitution, authorizes the enactment of the legislation under consideration. We see no merit in this contention. This phrase merely provides that the manner of supporting such institutions by the state may be prescribed by law. By no stretch of imagination can we see where it negatives the idea that such institutions are to be supported by the state. That support must come from the state, and the burden cannot be shifted, either directly or indirectly onto the shoulders of the counties." [254 P. 710 at 712.]

Similarly, in 1929, in *St. Louis-San Francisco Ry. Co. v. Morris,* 143 Okl. 160, 288 P. 306 (1929), and in *In re Protest of St. Louis-*

*San Francisco Ry. Co.,* 143 Okl. 145, 288 P. 307 (1929), the Court determined whether legislation which required counties to appropriate one mill for a tubercular fund used for funding the State institution for the treatment of tuberculosis was constitutional. Holding the legislative attempt to place the burden of supporting the tubercular institution upon counties to be unconstitutional, we stated in syllabus 2 of both cases that:

> "Under article 21 of the Constitution of Oklahoma, institutions for the care of tubercular patients, when maintained by the state, shall be at the expense of the state. Section 8970, C.O.S. 1921, which attempts to place that tax burden upon the counties, is in violation of the Constitution, and inoperative."

In 1933, in *Protest of Chicago, R.I. & P. Ry. Co.,* 164 Okl. 118, 23 P.2d 157 (1933), the Court was again asked to determine the constitutionality of statutes providing for the funding and care of tubercular patients. Since the Court's two opinions in 1929, the Legislature had amended Section 870 of the Compiled Oklahoma Statutes of 1921, providing that the ad valorem tax revenues appropriated could be used for the care of tubercular patients in the respective counties, for the prevention of conditions that are predisposing causes of tuberculosis and other devastating diseases, the prevention and control of epidemics, and for the expenses of county departments of health. Additionally, as in the prior Act, the funds were also to be used to pay for the expense of treatment at State sanatoria. Although the amendment authorized the expenditure of the appropriated ad valorem funds for county purposes, as well as State purposes, such amendment did not save the statute, as this Court once again found the Section to be unconstitutional, though we held that the use of such levies for the formation of county health departments and the treatment of patients by counties was constitutional.

In 1934, this Court, in *Chicago, R.I. & P. Ry. Co. v. Excise Board of Stephens County,* 168 Okl. 519, 34 P.2d 274 (1934), was re-quired to rule on the constitutionality of chap. 14, art. 5, §§ 1748–1755 O.S. 1931, commonly known as the Crippled Children's Act. In that case, we held that under Article 21, Section 1, of the Oklahoma Constitution, the University Hospital, as a State institution, maintained by the State, must be maintained at the expense of the State. We then held that insofar as the Crippled Children's Act attempted to impose a portion of the burden of maintaining the hospital on the county, it was unconstitutional and inoperative. In this case, this Court first recognized that such an attempt by the Legislature to use county ad valorem revenues for State purposes violated provisions of Article 10, Section 9, of the Oklahoma Constitution, as well as Section 1 of Article 21. In holding that the Crippled Children's Act violated Article 9, Section 10, as well as Article 21, Section 1, we stated:

> "It is contended by the protestant that a portion of the fund created by the levy may be used to maintain and support the University Hospital, a state institution; that a levy made for such a purpose is in contravention of that part of section 9 of article 10 of the state constitution as amended on August 15, 1933, which reads: 'No ad valorem tax shall be levied for state purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property is this State be used for State purposes.'
>
> "* * * This latter provision [article 1, section 21] has been held to prevent a county from contributing in whole or in part to the support and maintenance of a state institution. *Board of Commissioners of Logan County v. State ex rel. Short, Atty. General,* 122 Okl. 268, 254 P. 710; *St. Louis-San Francisco R. Co. v. Morris,* 143 Okl. 160, 288 P. 306; *Protest of Chicago, Rock Island & Pacific Ry. Co.,* 164 Okl. 118, 23 P.2d 157. *The provisions of section 9, art. 10, as amended, quoted supra, constitutes an additional reason for adhering to the views announced in the cited cases.*" [Emphasis added]

In 1952, the Court was once again called upon to determine the validity of legislation which apparently required county ad valo-

rem tax to be used for a State purpose.[2] In that case, *Battles v. State,* 206 Okl. 444, 244 P.2d 320 (1952), this Court reversed the judgment of a trial court, in which the trial court issued a writ of mandamus against the Excise Board of Muskogee County, requiring that board to comply with the provisions of the Crippled Children's Act, which required the members of County Excise Boards to appropriate ad valorem tax revenues to the Crippled Children's Budget Account. The statute before the Court, 10 O.S. Supp.1949 § 172.13, is quite similar to 10 O.S.1971 § 175.11, which is now before this Court. That 1949 statute read as follows:

"It shall be the duty of the board of county commissioners of each county of the State of Oklahoma to include in their respective estimates, and of the excise board of each county of the State of Oklahoma to appropriate for each fiscal year hereafter a sum equal to not less than the new proceeds of one-fifth (⅕) of one mill on the assessed valuation of their respective counties. Said appropriation is to be included within the regular county general fund appropriation for current expenses and set aside to care for the children accepted by the Commission upon application by the respective county court as provided in Section 12 of this Act (10 O.S.1949 Supp. § 172.12). This appropriation shall be known as the Crippled Children's Budget Account, and it shall be unlawful to use said Budget Account for any purpose other than those authorized in this Act (10 O.S.1949 Supp. §§ 172.1 through 172.16). No county shall be liable for any charge beyond the respective Crippled Children's Budget Account of the fiscal year and no more than twenty (20%) per cent of the total Crippled Children's Budget Account of any one county may be expended for any one patient during any fiscal year.

Claims filed by the Commission for payment by the county shall be sent to the respective county clerk and shall be allowed by the respective board of county commissioners if the same are found to be in keeping with the provisions of this Act."

In *Battles,* the 1949 statute was attacked as being violative of both Article 21, Section 1, and Article 10, Section 9, of the Oklahoma Constitution. Finding that the 1949 Act violated the provisions of Article 22, Section 1, because it provided for an indirect means of requiring counties to support and maintain State institutions, this Court, in *Battles,* found it unnecessary to fully consider whether the Act also violated Article 10, Section 9, of the Oklahoma Constitution, though we did state that the argument on that point did have merit.

From a careful consideration of the case law discussed above, we conclude that legislation such as that before us can be violative of both Article 21, Section 1, and Article 10, Section 9, of the Oklahoma Constitution.

First, such legislation can violate the provisions of Article 21, Section 1, of the Oklahoma Constitution, if it either directly or indirectly permits or requires that the county ad valorem revenues be used to support or maintain State institutions.

Second, such legislation may violate the provisions of Article 10, Section 9, of the Oklahoma Constitution, if it directly or indirectly requires county ad valorem tax revenues to be used for a State purpose.

## II.

■ The Petitioner, the Oklahoma Department of Human Services, argues that the Crippled Children's Fund, *as administered by the Department,* is not violating the Oklahoma Constitution, because inter-

---

2. In 1936, in the case of *Board of Com'rs of LeFlore County v. Central Nat. Bank,* 177 Okl. 11, 57 P.2d 257 (1936), this Court was called upon to determine whether, under the evidence presented in the trial court, a county warrant issued against the Crippled Children's Fund was shown to be invalid. In holding that the defendant had not presented sufficient evidence to show that the warrant was invalid, we were not asked to determine the constitutionality of the legislation establishing the Crippled Children's Fund. Thus, although this case dealt with the Crippled Children's Fund, it is of no aid in determining the issue before us.

nal administrative procedures of the Department prevent county ad valorem tax revenues from being expended for Department administrative costs, or for treatment provided in State institutions. Additionally, the Department argues that the present Fund is not unconstitutional because additional internal administrative procedures insure that the contribution of each county to the Fund is spent only for treatment and services provided for residents of that particular county. Even assuming that the Department's internal administrative procedures accomplish exactly what the Department claims, such does not keep the program established in the Crippled Children's Act from being violative of Article 10, Section 9, of the Oklahoma Constitution, which prohibits the expenditure of county ad valorem tax revenues for a State purpose. Whether Article 10, Section 9, is being violated depends upon whether county funds are being spent for a State, rather than a county, purpose. An analysis of the present Crippled Children's Act leads to but one conclusion—that the program being financed, in part, by county ad valorem tax revenues, is a State program. Thus, such funds are being used for a State purpose.

While it is true that counties, by virtue of the provisions of Article 17, Section 3, of the Oklahoma Constitution, have a duty to provide for county inhabitants who, "by reason of age, infirmity, or misfortune, may have claims upon the sympathy and aid of the county",[3] the mere fact that money is being used to aid county residents does not make a program a county program.

The Department of Human Services argues that since county ad valorem revenues are only used to pay for treatment provided to each county's residents, the funds are being appropriated and used for a county purpose, and thus, Article 10, Section 9, of the Oklahoma Constitution, is not being violated. We find this argument to be specious.

An analysis of the Act clearly shows that the program is a State program, in which the only function of the county is to provide the funds, then perform a ministerial function required prior to final payment.

Under the various provisions of the Act, the Oklahoma Public Welfare Commission—now the Department of Human Services—and its Director are empowered to organize, operate, and control the Crippled Children's Program and the State's Crippled Children's Fund. Even a cursory reading of the Act makes it clear that the program is a State program, controlled by a State department and State officers:

(1) The Commission, now the Department of Human Services, is authorized and directed to formulate a comprehensive and detailed plan for the purposes specified under the Act, and to make rules and regulations necessary or desirable for the administration of this plan and the implementation of the provisions of the Act. (10 O.S. 1971 § 175.5)

(2) The Commission, now the Department of Human Services, "shall" receive and expend in accordance with such plan, formulated by it, all necessary funds made available to it by the United States Government, by the State, subdivisions of the State, and other sources. (10 O.S. 1971 § 175.5)

(3) The Commission, now the Department of Human Services, is directed to establish and maintain such methods of administration as are necessary for effective and efficient operation of the comprehensive plan, formulated by it. (10 O.S. 1971 § 175.-5(d))

(4) The Commission, now the Department of Human Services, is designated as the State agency responsible for and having authority for the administration and operation of the

---

**3.** Article 17, Section 3, of the Oklahoma Constitution, provides:

"The several counties of the State shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity, or misfortune, may have claims upon the sympathy and aid of the county."

Crippled Children's Program. (10 O.S. 1971 § 175.4)

(5) The Commission, now the Department of Human Services, is designated as the State agency to supervise administration of any services relating to the program, not directly under the Department. (10 O.S. 1971 § 175.4)

(6) The Commission, now the Department of Human Services, is authorized and empowered to approve or disapprove hospitals, convalescent homes, boarding homes, nursing homes, or foster homes, and to contract for their services. (10 O.S. 1971 § 175.7)

(7) The Commission, now the Department of Human Services, is authorized and empowered to approve or disapprove professional services contemplated by the Act, and to contract for such services. (10 O.S. 1971 § 175.5)

(8) Applications for Crippled Children's services on behalf of a child are made to the Department of Human Services. (10 O.S. 1971 § 175.10(a))

(9) The Director of the Department of Human Services is empowered to decide whether a child will be accepted or rejected for services under the program. (10 O.S. 1971 § 175.10(a))

(10) The Director, on behalf of the Department of Human Services, may accept or reject any child's application to receive services under the Crippled Children's Act. (10 O.S. 1971 § 175.10(a))

(11) Upon acceptance of an application, the Director, on behalf of the Department, "shall" determine the extent of eligibility for care under the Act. (10 O.S. 1971 § 175.10(a))

The Crippled Children's Act, as can be seen from the above, is a State program, controlled and administered by a Department of the State and State officers. Accordingly, we hold that the provisions of the Act which require that county ad valorem tax revenues be appropriated to fund the program constitute an appropriation of county ad valorem revenues for a State purpose, and thus, such provisions violate Article 10, Section 9, of the Oklahoma Constitution, which provides in part that:

"No ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes."

In arriving at this holding, we would note that although under the provisions of Article 17, Section 3, the counties *may* have an obligation to provide for crippled children within their boundaries, it is for the counties to decide how such services will be provided. The simple fact that a State program may enable counties to discharge their responsibility, if any, does not empower the State to appropriate county funds for use in the State program.

### III.

We also find that the provisions of the Crippled Children's Act requiring the expenditure of county ad valorem tax revenues also violate the provisions of Article 21, Section 1, quoted above, for the following reasons:

First, even assuming that the Department, through its internal procedures, could avoid spending ad valorem taxes for services rendered in State institutions, and for administration costs, the existence of such internal procedures does not keep the statute from being unconstitutional. Under the statutory scheme county funds may be used to support State institutions, thus, the statute violates the provisions of Article 21, Section 1, which require that State funds, not county funds, be expended to support and maintain state institutions.

Secondly, even if no ad valorem taxes were directly used to support State institutions, and assuming such were required by the statute, the statute would still violate Article 21, Section 1, as the statute establishes a method for indirectly supporting State institutions. This is so because the use of the county ad valorem tax revenues

to support noninstitutional and nonadministrative aspects of the State program enables the State to use more of its own funds, as well as Federal funds, to support State institutions used in the program. For this reason, we hold that the statutory mandate constitutes an indirect means of supporting and maintaining State institutions, which, as we have seen above, violates Article 21, Section 1, of the Oklahoma Constitution.

Lastly, we note that the Department of Human Services argued that the Respondent County Commissioners and the members of County Excise Boards cannot avoid the issuance of a Writ of Mandamus by relying upon the unconstitutional nature of the statutes sought to be enforced, despite the fact that the Attorney General had issued a formal opinion stating that the statute is unconstitutional. We simply find no merit to this argument.

For the above stated reasons, we hold that the provisions of the Crippled Children's Act, which required that county ad valorem tax revenues be appropriated to support the programs established under the Act, are violative of both Article 10, Section 9, and Article 21, Section 1, of the Oklahoma Constitution. Accordingly, we refuse to issue the Writ of Mandamus prayed for.

ORIGINAL JURISDICTION ASSUMED. PETITION FOR THE ISSUANCE OF A WRIT OF MANDAMUS DENIED.

All Justices concur.