2015 OK CIV APP 86

**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF BRYAN, Petitioner/Appellee,**

v.

**OKLAHOMA DEPARTMENT OF CORRECTIONS, Respondent/Appellant.**

No. 112,277.

Court of Civil Appeals of Oklahoma, Division No. 4.

Nov. 4, 2015.

Emily Redman, District Attorney, Greg Jenkins, Assistant District Attorney, Atoka County District Attorney's Office, Atoka, Oklahoma, for Petitioner/Appellee.

David Cincotta, General Counsel, Margie Weaver, Assistant General Counsel, Oklahoma Department of Corrections, Oklahoma City, Oklahoma, for Respondent/Appellant.

P. THOMAS THORNBRUGH, Judge.

¶ 1 The Oklahoma Department of Corrections (DOC) appeals the declaratory judgment of the district court holding that 57 O.S.2011 §§ 37 and 38 act unconstitutionally if counties are required to spend more than the maximum reimbursement stated by § 38 to hold a state inmate. We affirm the judgment of the district court.

## BACKGROUND

¶ 2 This case involves the interaction between a state statute and the Oklahoma Constitution. The statute, 57 O.S.2011 § 38, sets a maximum reimbursement rate of $27 per day for any county keeping a state inmate at a county facility after judgment and sentencing. The constitutional provisions are Oklahoma Constitution, Article 10, Section 9 (which prohibits the use of *ad valorem* tax revenue for state purposes), and Article 21, Section 1 (which requires the State to fund penal institutions). In 2011, Senator Josh Brecheen of District 6 requested an opinion from the State Attorney General as to the constitutionality of this reimbursement cap.

¶ 3 In the resulting opinion, 2011 OK AG 8, the Attorney General opined that, if the $27 per day payment was insufficient to defray the full cost to a county of housing state inmates who were retained in the county's jail facilities after sentencing, paying any excess cost from the county's funds would violate Article 10, Section 9, and Article 21, Section 1. The Attorney General also opined Article 21 required the State to fully reimburse a county if the statutory reimbursement was insufficient. DOC determined it could not follow this opinion, finding that it was statutorily bound to limit reimbursement to $27 per day by § 38, and was not required to follow the Attorney General's opinion regarding the constitutionality of a statute.

¶ 4 In June 2012, the Board of County Commissioners of Bryan County (County) filed a petition in Oklahoma County District Court seeking declaratory judgment as to the constitutionality of the § 38 reimbursement cap. The district court reached the following conclusions despite jurisdictional and other objections by DOC:

10. The housing of inmates sentenced to incarceration within the Department of Corrections in county jails prior to their transfer to the Department of Corrections is a **State purpose** for purposes of **Article X, Section 9(a)** of the Oklahoma Constitution and is additionally a **function of penal institutions** of the State of Oklahoma for purposes of **Article XXI, Section 1** of the Oklahoma Constitution.

11. The reimbursement provided by 57 O.S. Secs. 37 and 38 for inmates sentenced to incarceration within the Department of Corrections for the cost of housing said inmates in county jails until their transfer to a Department facility **violates the provisions of Article X, Section 9(a)** of the Oklahoma Constitution where such reimbursement does **not defray the full cost** to

a particular county of housing such inmates for any particular day as such **requires counties to expend ad valorem tax** revenues for State purposes, i.e. payment of the shortfall for the actual cost of housing Department of Corrections inmates in county jails.

12. Additionally, any reimbursement under 57 O.S. Secs. 37 and 38 which **does not defray the full cost** to a particular county of housing such inmates for any particular day **violates the provisions of Article XXI, Section 1** of the Oklahoma Constitution in that, in such situation, counties are **forced to use county resources to support a state institution** by paying the shortfall between the statutory reimbursement and the actual cost of housing said inmates.

13. **Whenever** a county's cost of housing an inmate sentenced to incarceration within the Department of Corrections exceeds the reimbursement received by said county pursuant to Sections 37 and 38 of Title 57 for any particular day or period, **said county is entitled to reimbursement** from the State of Oklahoma in an amount sufficient to fully reimburse the costs of housing incurred by the county for such inmate without being limited by the cap limit provided by 57 O.S. Sec. 38 **to avoid violation of the provisions of Article XXI, Section 1 and Article X, Section 9(a) of the Oklahoma Constitution.** (Emphasis added.)

DOC now appeals these findings.

## STANDARD OF REVIEW

¶ 5 County's constitutional challenge to this statute presents a question of law, which we review *de novo*. An appellate court will exercise its "plenary, independent and non-deferential authority" when reexamining a trial court's legal rulings. *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125 n. 1, 932 P.2d 1100. This Court's standard of review is *de novo* and gives no deference to the legal rulings of the trial court. *State ex rel. Dept. of Human Serv. ex*

*rel. Jones v. Baggett*, 1999 OK 68, ¶ 4, 990 P.2d 235. Regarding questions of constitutionality, this Court will not declare an act of the Legislature "void unless it is clearly, palpably, and plainly inconsistent with the terms of the Constitution." *Hazel–Atlas Glass Co. v. Walker*, 1945 OK 176, ¶ 4, 195 Okla. 470, 159 P.2d 268.

## ANALYSIS

### I. JURISDICTION

¶ 6 DOC's first argument is that County did not demonstrate it had actually used County funds to "top off" the maximum allowed reimbursement of $27 per day per inmate. Therefore, DOC argues, County failed to show a justiciable controversy, or failed to show that the controversy is ripe for judicial determination by declaratory judgment.

¶ 7 The proof required for County to establish its right to pursue declaratory relief is set out in *Gordon v. Followell*, 1964 OK 74, ¶ 8, 391 P.2d 242 (internal quotation marks omitted):

The requisite precedent facts or conditions which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows: (1) there must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy, that is to say, a legally protectible interest; and (4) the issue involved in the controversy must be ripe for judicial determination.

¶ 8 The Oklahoma Supreme Court recently addressed standing in a declaratory judgment action by a county in *Murray County v. Homesales, Inc.*, 2014 OK 52, 330 P.3d 519. That opinion contains an extensive and detailed analysis of a similar standing issue, and the result is instructive.

¶ 9 In *Murray County*, a group of counties sued for declaratory judgment regarding the liability of the defendant Homesales, Inc.,

pursuant to the Documentary Stamp Tax Act, 68 O.S.2011 §§ 3201 through 3206. Defendant Homesales received deeds to four properties that JP Morgan Chase Bank, N.A., had purchased at mortgage foreclosure sales. The conveyances stated that the deeds were exempt from documentary taxes. The counties sought a declaratory judgment that these transactions were not exempt because the exemption from documentary tax applied only to the purchaser, Chase Bank, and not its transferee, Homesales. The district court agreed, finding the transactions were subject to the documentary tax.

¶ 10 On appeal, Homesales challenged the counties' standing to seek declaratory relief, partly on the basis that tax was due only if the conveyance was made for consideration exceeding $100, and *the conveyances in question did not recite consideration.* The *Murray County* opinion reached the conclusion that: (1) the involved counties had standing to challenge the exemptions from documentary taxes claimed in the case, but (2) the counties failed to prove that any of the properties subject to those conveyances were "sold" for purposes of § 3201, because there was no evidence of whether the consideration exceeded the statutory $100 trigger. *Murray County* therefore held that, although the counties had standing to pursue the tax question and obtain a judgment that the transfers *would be subject to tax* if the consideration exceeded $100, they had not shown taxes were *actually due* on the specific transactions in question.[1]

¶ 11 The situation in this case is strongly analogous. Here, County has *not* shown that its expenditures actually exceeded the $27 cap set by the Legislature, just as Murray County had not shown that the consideration for the challenged transfers was greater than $100. However, Murray County had standing to seek, and receive, a declaration that taxes were due *if and when* the consideration at transfer exceeded $100. Likewise, County has standing to seek a declaration that 57 O.S.2011 §§ 37–38 act against Article 10, Section 9, and Article 21, Section 1, of the Oklahoma Constitution, and that reimbursement is due *if and when* County is required

to expend more than the statutorily capped reimbursement to maintain state inmates awaiting transfer. "If standing exists, the case must proceed on the merits." *Indep. Sch. Dist. No. 9 v. Glass,* 1982 OK 2, ¶ 10, 639 P.2d 1233.

¶ 12 We further note that this issue is of broad policy and constitutional dimensions, and may involve officials, who have sworn an oath to uphold the state Constitution, being required, as part of their official duties, to violate that same Constitution. It further involves competing policy considerations expressed in the state Constitution and in a legislative enactment. Thus, the matter appears to fall under the rule of *Gentges v. Okla. State Election Bd.,* 2014 OK 8, ¶¶ 6–12, 319 P.3d 674, that the traditional standing requirements are eased in matters of "great public importance" and those involving "competing policy considerations."

## II. THE AMICUS BRIEF

¶ 13 The Board of County Commissioners of Tulsa County and the Tulsa County Sheriff filed an amicus brief in this case. DOC objected on the grounds that the brief went beyond the issues raised by the parties in the district court and that the brief attempted to supplement the record below. We will consider the brief only so far as it complies with the appropriate Supreme Court Rules. The brief also includes a request that the Court "convert this appeal to an original action." The appellate docket sheet does not note this request, and we find no guidance procedurally as to whether such a request must be made by application or may be contained within a brief. However, the matter was assigned to this Court without notation of original action by the Supreme Court, and we take this fact as a tacit denial of the request.

## III. THE STATE FUNDING OBLIGATION AND *AD VALOREM* TAX

A. Is County Funding for the Confinement and Upkeep of State Inmates Constitutionally Barred?

¶ 14 DOC argues that Article 21, Section 1, does not mandate that state funding be the

---

1. *See also* the standing analysis in the case of *Marshall County, Okla. v. Homesales, Inc.,* 2014

OK 88, 339 P.3d 878, citing the Murray County opinion.

sole source of funding for the confinement and upkeep of state inmates, and that requiring counties to pay part of this cost therefore does not violate the Oklahoma Constitution. Article 21, Section 1, provides as follows:

> Educational, reformatory, and penal institutions and those for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public good may require, shall be established and supported by the State in such manner as may be prescribed by law.

Oklahoma Constitution Article 10, Section 9(a), states, in relevant part:

> No ad valorem tax shall be levied for State purposes, nor shall any part of the proceeds of any ad valorem tax levy upon any kind of property in this State be used for State purposes. (Emphasis added.)

¶ 15 DOC argues that, because some Article 21 state institutions are partially supported by tuition fees, user fees, or federal grants, Article 21 does not mandate "state" funding of these institutions. Our jurisdiction here does not extend to declaring in detail what methods the State may use to support Article 21 institutions. The question raised by this appeal is not the broad question of what sources of funding are allowed, but the narrower question of whether funding *by the counties* is prohibited.

¶ 16 Regarding the specific use of county funds, the Supreme Court interpreted the "shall be ... supported by the State" language of Article 21, Section 1, in *Chicago, R.I. & P. Ry. Co. v. Excise Bd. of Stephens County,* 1934 OK 392, 168 Okla. 519, 34 P.2d 274. In that case, the Court examined the use of a county *ad valorem* tax levy for the "crippled children's fund of Stephens County" to partially maintain and support a state institution, the University Hospital.

¶ 17 The Court found:

> [The levy] violates article 21 of the state Constitution.... This latter provision has been held to prevent a county from contributing in whole or in part to the support and maintenance of a state institution. *Board of Commissioners of Logan County v. State ex rel. Short, Atty. Gen.,* 122 Okla. 268, 254 P. 710 [(1927)]; *St. L.-S.F. Ry.*

*Co. v. Morris,* 143 Okl. 160, 288 P. 306 [(1930)]; *Protest of C., R.I. & P. Ry. Co.,* 164 Okla. 118, 23 P.2d 157 [(1933)]. The provision of section 9, art. 10, as amended, quoted, supra, constitutes an additional reason for adhering to the views announced in the cited cases.

*Id.,* ¶¶ 6–7. The holding of *Stephens County* cited both the duty of the State to fund Article 21 institutions, as well as the requirement that *ad valorem* funds not be used to fund state purposes, as constitutional bars to the levy.

¶ 18 In 1981, the Supreme Court addressed the issue again in *State ex rel. Dep't of Human Servs. v. Malibie,* 1981 OK 18, 630 P.2d 310. *Malibie* examined a provision of the "Crippled Children's Act," then found at 10 O.S. § 175.11, which required counties to appropriate "at least one-fifth (1/5) of one mill on the assessed valuation of their respective counties" for use by the "Crippled Children's Program." *Id.,* ¶ 2. As it did in *Stephens County,* the Court held that the use of *ad valorem* tax revenues to fund the program violated both Article 10, Section 9, and Article 21, Section 1.

¶ 19 *Malibie* further analyzed a series of historical cases regarding the interaction of Article 10, Section 9, and Article 21, Section 1. The opinion cited again the statement of *Stephens County* that Article 21, Section 1, has been held to prevent a county from contributing in whole or in part to the support and maintenance of a state institution. *Id.,* ¶ 13.

B. Do *Stephens County* and *Malibie* Prohibit *Any* County Funding of the State Prisons, or Only County Funding Via *Ad Valorem* Tax?

¶ 20 The parties to the current appeal place different interpretations on *Stephens County* and *Malibie.* County argues that these cases prohibit *any* use of County funds to support the specific institutions listed in Article 21, Section 1 ("Educational, reformatory, and penal institutions and those for the benefit of the insane, blind, deaf, and mute"). DOC argues that *Stephens County* and *Malibie* prohibit only the use of County's *ad valorem* tax revenue to support state penal

institutions, but do not prohibit the use of other County revenues.[2]

¶ 21 The earlier cases cited by *Stephens County* examined the "Lunacy Law of 1917" (then codified as 74 O.S. §§ 8280 through 8325). At that time, § 8291 made the county from which a "public patient" came "liable to the state for a certain portion of the expense of keeping him" in a state hospital for the mentally ill. *Bd. of Comm'rs of Logan Cnty. v. State*, 1927 OK 40, ¶ 2, 122 Okla. 268, 254 P. 710. There, the Court concluded that:

> The mandatory provisions of the Constitution of this state are that such hospitals for the insane shall be "established and supported by the state." This is what the people in adopting our Constitution, have said that the state shall do, and this, in our opinion, is exactly what the Legislature has undertaken to say the counties shall, and the state shall not do. This being so, the act is undoubtedly void.

*Id.*, ¶ 9. Neither § 8291 nor the Court in *Logan County* mentioned *ad valorem* taxation as the source of the funds that the counties were required to pay to support an Article 21 institution. The cases of *St. Louis–San Francisco Ry. Co. v. Morris*, 1930 OK 247, 143 Okla. 160, 288 P. 306, and *Protest of Chicago, R.I. & P. Ry. Co.*, 1933 OK 384, 164 Okla. 118, 23 P.2d 157, came to similar conclusions, but those cases did involve *ad valorem* tax.

¶ 22 All of these early cases cite Article 21, Section 1, as controlling and not Article 10, Section 9, because the language that "no part of the proceeds of any *ad valorem* tax levy upon any kind of property in this State be used for State purposes" *was not present in Article 10, Section 9, at that time*. The initial language restricting the use of county *ad valorem* tax for state purposes was added to Article 10, Section 9, by referendum in 1933.

¶ 23 These early cases indicate that, prior to the specific amendment of Article 10, Section 9, to prohibit the use of counties' *ad valorem* tax for "state purposes," *Article 21, Section 1, prohibited any county support for Article 21 institutions, including the penal system*. We find no language in Article 21, Section 1, that could be interpreted as barring counties' funding of Article 21 institutions *only* if the funding is via *ad valorem* tax. Article 21 mandates that the State *shall* support the listed institutions, and the courts have consistently confirmed this interpretation as barring county support. We cannot graft the phrase "shall be established and supported by the State *unless funding may be obtained from a county source other than ad valorem tax*" onto Article 21 or the accompanying case law.[3]

¶ 24 We find no indication that either the 1933 referendum or later changes to Article 10, Section 9, overruled *Logan County* or changed the prior meaning of Article 21. The amendments to Article 10, Section 9, *expanded* the ban on county funding. Not only was county funding of Article 21 institutions prohibited, but, in addition, county funding of *any state purpose* was prohibited if *ad valorem* tax money was used.

■ ¶ 25 In total, we find that the two constitutional provisions have a similar but distinctly different effect. Article 21, Section 1, forbids *any* use of county funds to support the *identified institutions* that "shall be established and supported by the State," while Article 10, Section 9, forbids the specific use of *ad valorem* tax revenue to support the broader category of general "*State purposes*." As state prisons are an identified institution in Article 21, Section 1, it prohibits the use of any county funds to support them, not simply funds derived from *ad valorem* taxes.[4]

---

2. We find no record that County has any sources of funding beyond *ad valorem* tax, and no record that any other source of funding that might be available would be sufficient to defray the cost of holding state inmates.

3. We further note that, although *Stephens County* and *Malibie* involved the use of county *ad valorem* tax revenue to support a state institution, the Court cited Article 21, Section 1, and not Article

10, Section 9, as the primary basis for its decision. *Stephens County*, 1934 OK 392, ¶ 7, 168 Okla. 519, 34 P.2d 274, bases its rule on Article 21, Section 1, citing Article 10, Section 9, as an "additional reason," even though *ad valorem* tax funds were used in that case.

4. A contrary holding—that only the use of *ad valorem* tax monies was barred by Article 21— would require a segregation of fungible revenue

## IV. STATE PURPOSES

### A. Is Expenditure of County Funds Required?

¶ 26 DOC argues that the Legislature made no direct command in 57 O.S.2011 § 38 that County "make up" any costs of housing state inmates that exceed the $27 per day maximum reimbursement. Hence, DOC contends that § 38 does not *require* any use of *ad valorem* tax for state purposes or county revenue to support an Article 21 state institution.

¶ 27 We find this outcome, however, to be an inevitable and intended consequence of 57 O.S.2011 § 38 setting a *maximum reimbursement rate* of $27 per inmate per day for any county.[5] Section 38 states in relevant part:

[T]he Department of Corrections shall reimburse any county, which is required to retain an inmate pursuant to paragraph 2 of Section 37 of this title, in an amount not to exceed Twenty-seven Dollars ($27.00) per day for each inmate during such period of retention.

¶ 28 In setting a *maximum* ceiling for reimbursement, the Legislature inherently contemplated that a county may exceed this amount in actual costs. Otherwise, the ceiling would be superfluous. The Legislature will not be presumed to have done a vain and useless act in the promulgation of a statute. *In re Sup. Ct. Adjudication*, 1979 OK 103, ¶ 6, 597 P.2d 1208. Thus, the Legislature either intended for counties to make up any excess cost from the counties' own funds, or to require them to reduce the cost of housing a state inmate to less than $27 per day.

¶ 29 A county, however, does not have complete control of the cost of housing state inmates in county facilities. Pursuant to 57 O.S.2011 § 60, "Whenever a prisoner is committed for crime, or in any suit in behalf of the state, the county board **shall** allow the sheriff his **reasonable charge** for supplying such prisoners" (emphasis added). A county is not, therefore, empowered to dictate the cost of holding state inmates to the sheriff. If counties cannot dictate the maximum costs to the sheriff, they cannot potentially reduce costs in response to the legislative directive. We therefore find that § 38 requires counties to make up any excess beyond the $27 per day maximum reimbursement, which again violates Article 21 where the reasonable cost is greater than $27 per day.

### B. Is Maintaining Inmates in County Facilities After Sentencing a State or County Responsibility?

¶ 30 DOC further argues that retaining inmates after judgment and sentencing is either not a state purpose, or is a hybrid state/county purpose. DOC first argues that County is *free to release inmates at any time after judgment and sentencing,* and thus voluntarily retains them for County's purposes until transferred to a DOC facility. We do not accept, however, that either the legislation in question or the Oklahoma Constitution acts to force such an irresponsible "choice" to either unconstitutionally subsidize a state institution or to release inmates waiting for transfer.

¶ 31 DOC next argues that inmates do not become the responsibility of the State on the date of judgment and sentencing, and hence costs after this date are still incurred for a county purpose. Title 57 O.S.2011 § 37(D) provides, in part, as follows:

Once the judgment and sentence is transmitted to the Department of Corrections, the Department will be responsible

---

receipts by the counties to show that *ad valorem* taxes, rather than other revenues, were being used to support state prisons. If funding of state prisons from county *ad valorem* taxes is unconstitutional, but funding from other sources of county revenue is constitutional, this would lead to further complications: a county would argue that *ad valorem* funds *were* used, while the State would likely argue that the Constitution *requires* a county to fund any excess expenses above $27/day from *non-ad valorem funds first,* raising an-other constitutional question as to whether the State or the Oklahoma Constitution may direct county funding in this way.

5. Unless, of course, the Legislature constantly raises the maximum reimbursement to ensure it is always greater than the cost incurred by the counties, although the purpose of setting a "maximum reimbursement" at all under such circumstances is unclear.

for the cost of housing the inmate in the county jail from the date the sentence was ordered by the court until the date of transfer of the inmate from the county jail. The cost of housing shall be the per diem rate specified in Section 38 of this title....

¶ 32 Section 37 is clear that, although the State does not incur any liability until a judgment and sentence is *transmitted* to DOC, such liability is retroactive to the date the sentence was ordered by the court. After this date, DOC is responsible for the "cost of housing" an inmate in the county jail. We find it a highly strained interpretation of § 37 to consider that the Legislature made DOC responsible for the cost of housing an inmate *if housing the inmate is not yet a responsibility of DOC.*

¶ 33 We further note that DOC inmates housed by contract in private prisons are still considered to be housed in the state penal system.[6] Again, we find no rationale by which DOC may pay for incarcerating its inmates in a private facility as a *state purpose,* while incarcerating the same inmates in a county facility remains a county purpose.

### C. Is Maintaining Inmates in County Facilities After Sentencing a Hybrid Responsibility?

¶ 34 DOC finally argues that various statutory duties of County and the sheriff toward inmates (such as feeding, housing, medical care, transportation, and protection) remain in effect while the inmates are housed in County's facilities, and hence the incarceration serves joint state and county purposes. This argument does not remove the inherent constitutional problem, because if there is *any ad valorem* tax funding of a state purpose or *any* county funding of an Article 21 institution without full reimbursement, the funding is still prohibited. The argument therefore goes only to the method of calculating when the § 38 reimbursement is too little; e.g., should some functions be assessed as "county duties" that DOC need not reimburse?

**6.** *See e.g.,* 57 O.S.2011 § 566.4, extending the protections of the Oklahoma Governmental Tort

¶ 35 Statutory duties, however, cannot overcome the requirements of the Oklahoma Constitution or require unconstitutional actions. If, as was previously held by the Supreme Court, Article 21, Section 1, forbids *any* use of county funds to support the state penal system, we cannot interpret the various statutes detailing the duties of a county or sheriff to inmates as requiring an unconstitutional result. We therefore find that these statutes do not create a continued county funding responsibility after the date of judgment and sentence.

### CONCLUSION

1. Inmates are held in County facilities for a "state purpose" on behalf of the state penal system after the date of judgment and sentence.

   a) The state penal system is among the institutions specifically identified by Article 21, Section 1, that the State "shall" fund.

   b) Requiring counties to devote any of their own funding to support the state penal system thus violates Article 21, Section 1, of the Oklahoma Constitution.

2. Requiring counties to devote any of their *ad valorem* tax revenue to this state purpose also violates Article 10, Section 9, of the Oklahoma Constitution.

3. By capping reimbursement for this state purpose or for support of the state penal system, 57 O.S.2011 § 38 acts unconstitutionally *if and when* a county expends more than the statutorily capped reimbursement amount for this state purpose or to support the state penal system.

4. The record contains no evidence that County is currently spending more than the statutorily capped reimbursement amount for this state purpose or to support the state penal system; hence, we find no evidence of a constitutional violation by the State or any right of reimbursement to County at this time.

Claims Act to an "employee, agent, or servant" of a private correctional company.

¶ 36 Accordingly, the decision of the district court is affirmed.

¶ 37 **AFFIRMED.**

RAPP, P.J., and BARNES, J., concur.